IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| JULIA WIECK, on behalf of herself and all others similarly situated,<br><br>             Plaintiff,<br><br>   vs.<br><br>CIT GROUP, INC.; CIT BANK, N.A.; FINANCIAL FREEDOM; SEATTLE SPECIALTY INSURANCE SERVICES, INC.; CERTAIN UNDERWRITERS OF LLOYD'S, LONDON; and, GREAT LAKES REINSURANCE (UK), PLC,<br><br>            Defendants. | Civ. No. 16-00596 JMS-RLP<br><br>ORDER GRANTING IN PART AND DENYING IN PART MOTIONS TO DISMISS, ECF NOS. 55, 56 & 59, AND GRANTING PLAINTIFF'S MOTION REQUESTING JUDICIAL NOTICE OF OFFICIAL GOVERNMENT REPORTS, ECF NO. 67 |

## ORDER GRANTING IN PART AND DENYING IN PART MOTIONS TO DISMISS, ECF NOS. 55, 56 & 59, AND GRANTING PLAINTIFF'S MOTION REQUESTING JUDICIAL NOTICE OF OFFICIAL GOVERNMENT REPORTS, ECF NO. 67

## I. INTRODUCTION

In this putative class action, Plaintiff Julia Wieck ("Plaintiff" or "Wieck") seeks damages and injunctive relief on behalf of herself and others similarly situated, alleging several causes of action based on lender-placed insurance ("LPI") or "force-placed" insurance on her reverse mortgage —

specifically, hurricane coverage. (Throughout this Order, the court refers to LPI and force-placed insurance interchangeably.) Wieck claims Defendants overcharged her and improperly benefitted from the placement in violation of state and federal laws. Three sets of Defendants have filed Motions to Dismiss the First Amended Complaint ("FAC"). ECF Nos. 55, 56, 59. Based on the following, the Motions are GRANTED in PART and DENIED in PART.

## II. BACKGROUND

### A.    Factual Background

The 73-page FAC, ECF No. 15, makes both individual and class allegations. It bases federal jurisdiction on the Class Action Fairness Act of 2005, Pub. L. No. 109-2, 119 Stat. 4 — it alleges minimal diversity of citizenship under 28 U.S.C. § 1332(d)(2)(A); an aggregated amount-in-controversy of over $5,000,000 under 28 U.S.C. § 1332(d)(6); and a class of over 100 members under 28 U.S.C. § 1332(d)(5)(B). Given the FAC's length and that it is very premature to address class matters, the court does not reiterate all the pertinent allegations of the FAC. Rather, the court focuses on factual allegations as to Wieck to examine whether she has alleged sufficient facts to withstand the Motions to Dismiss. And in so doing, the court sets forth only the essential allegations as necessary to

understand the nature of Wieck's claims.  Further details are also provided in the

appropriate discussion sections that follow.

For purposes of these Motions, the court assumes the following

factual allegations are true.  *See, e.g.*, *Turner v. City & Cty. of S.F.*, 788 F.3d 1206,

1210 (9th Cir. 2015) ("In assessing whether a party has stated a claim upon which

relief can be granted, a court must take all allegations of material fact as true and

construe them in the light most favorable to the nonmoving party[.]").

### 1.     *Wieck Obtains a Reverse Mortgage From and Serviced by CIT*

Wieck is an 86-year old resident of Lahaina, Maui.  FAC ¶ 4.  She has

lived at her residence ("the Property") for over thirty-eight years, and obtained a

reverse mortgage on the Property from Defendant Financial Freedom Senior

Funding Corporation ("Financial Freedom") in 2006.  *Id.*; FAC Ex. A, ECF No.

15-1 ("Home Equity Conversion Mortgage").

> Reverse mortgages are government backed loans that
> allow Americans over the age of sixty-two (62) to borrow
> against the value of their homes.  Borrowers do not have
> to pay interest on their reverse mortgage loan and can
> live in their homes for life.  A sale of the property can be
> used to repay the debt.  The reverse mortgage loans are
> backed by insurance from the Federal Housing
> Administration ("FHA").  When a loan comes due, the
> loan servicer can earn interest on the loan from the FHA
> by meeting deadlines for certain tasks such as getting an
> appraisal and starting the foreclosure process.  If the loan
> servicer misses the FHA deadlines, the service is not

entitled to earn interest from the FHA while waiting for the agency to pay its claim.

FAC ¶ 17.

Traditionally, a reverse mortgage is meant to come due and payable when the resident dies. However, there are other events which may cause the reverse mortgage to become due and payable, such as the borrower's failure to pay property taxes or insurance, or the property is deemed vacant, thus enabling the loan servicer to commence foreclosure proceedings.

*Id.* ¶ 18.

Financial Freedom is a division of Defendant CIT Bank, N.A. ("CIT Bank"). FAC ¶ 5. CIT Bank is a wholly owned subsidiary of Defendant CIT Group, Inc. ("CIT Group"), which is a financial holding company. *Id.* ¶ 7. Where appropriate, the court refers to Financial Freedom, CIT Bank, and CIT Group collectively as "CIT," and sometimes refers to actions taken by Financial Freedom as taken by CIT.

"Until 2011, Financial Freedom originated and serviced reverse mortgages. Financial Freedom aggressively marketed reverse mortgages to elderly consumers . . . . In 2011, Financial Freedom stopped making new loans and operated exclusively as a reverse mortgage loan servicer." *Id.* ¶ 19. Financial Freedom was a subsidiary of IndyMac Bank, FSB, when Wieck's loan was originated. *Id.* ¶¶ 5, 19, 65 & Ex. A. IndyMac Bank was a predecessor of

OneWest Bank FSB, which changed its charter from a federal savings bank to a

national association on February 28, 2014, and eventually became CIT Bank, N.A.

*See* Balettie Decl. ¶ 5, ECF No. 55-2.

Among others, Wieck's reverse mortgage with CIT contains the

following potentially relevant provisions:

> **2. Payment of Property Charges**. Borrower shall pay all property charges consisting of taxes, ground rents, flood and hazard insurance premiums, and special assessments in a timely manner, and shall provide evidence of payment to Lender, unless Lender pays property charges by withholding funds from monthly payments due to the Borrower or by charging such payments to a line of credit as provided for in the Loan Agreement.

> **3. Fire, Flood and Other Hazard Insurance**. Borrower shall insure all improvements on the Property, whether now in existence or subsequently erected, against any hazards, casualties, and contingencies, including fire. This insurance shall be maintained in the amounts, to the extent and for the periods required by the Lender or the Secretary of Housing and Urban Development ("Secretary"). Borrower shall also insure all improvements on the Property, whether now in existence or subsequently erected, against loss by floods to the extent required by the Secretary. . . .
> . . . .
> **5. Charges to Borrower and Protection of Lender's Rights in the Property**.
> . . . .
> If Borrower fails to make these payments or the property charges required by Paragraph 2, or fails to perform any other covenants and agreements contained in

this Security Instrument, . . . then Lender may do and pay whatever is necessary to protect the value of the Property and Lender's rights in the Property, including payment of taxes, hazard insurance and other items mentioned in Paragraph 2.

To protect Lender's security in the Property, Lender shall advance and charge to Borrower all amounts due to the Secretary for the Mortgage Insurance Premium as defined in the Loan Agreement as well as all sums due to the loan servicer for servicing activities as defined in the Loan Agreement. Any amounts disbursed by Lender under this Paragraph shall become an additional debt of Borrower as provided for in the Loan Agreement and shall be secured by this Security Instrument.

**6. Inspection.** Lender or its agent may enter on, inspect or make appraisals of the Property in a reasonable manner and at reasonable times provided that Lender shall give the Borrower notice prior to any inspection or appraisal specifying a purpose for the inspection or appraisal which must be related to Lender's interest in the Property. If the Property is vacant or abandoned or the loan is in default, Lender may take reasonable action to protect and preserve such vacant or abandoned Property without notice to the Borrower.
. . . .
**9. Grounds for Acceleration of Debt.**
. . . .
(b) **Due and Payable with Secretary Approval.** Lender may require immediate payment in full of all sums secured by this Security Instrument, upon approval of the Secretary, if:
. . . .
(iii) An obligation of the Borrower under this Security Instrument is not performed.

FAC ¶ 66 (language modified as in Mortgage, Ex. A).

## 2. *"Windstorm (including hail/hurricane)" Coverage is Force Placed on Wieck's Mortgage*

The FAC makes various allegations about whether Wieck had "windstorm" coverage, whether she initially understood that separate hurricane coverage was required, and whether CIT accepted or approved the mortgage in 2006 without requiring hurricane coverage (which is often excluded from general hazard property insurance, and requires a separate rider).  FAC ¶¶ 67-69.  But the parties essentially agree (at least for purposes of these Motions) that some kind of coverage against damage from hurricanes is required under the mortgage — and the fundamental dispute alleged in the FAC stems from this requirement.[1]  Wieck also does not dispute that CIT is allowed to force-place coverage if necessary.  Rather, the dispute centers on the manner and terms upon which such coverage is placed.

"[O]n or around August 24, 2010, Financial Freedom notified Plaintiff that she did not have windstorm coverage, which was incorrect, and that it would force place a windstorm insurance policy (backdated to February 15,

---

[1] The FAC also alleges that CIT "waived any requirement that Plaintiff obtain hurricane coverage" because it accepted her (deficient) hazard policy "as is" in November 2006, and did not assert the right to place hurricane coverage until 2010.  FAC ¶ 91.

2010), and would charge Plaintiff $10,000 plus for the policy." *Id.* ¶ 70. "A second notice from Financial Freedom requiring Plaintiff to provide proof of windstorm coverage was mailed on or about September 21, 2010." *Id.* The actual August 24, 2010 letter from Financial Freedom states in pertinent part: "Financial Freedom Acquisition LLC has been notified by your insurance provider that your current property insurance policy does not include windstorm coverage . . . . If your property were to incur hurricane or other wind damage it would not be covered." ECF No. 55-4.[2]

After reviewing Wieck's response, FAC ¶ 71, on or about November 15, 2010, CIT notified her that it was placing proper windstorm coverage on her property. *Id.* ¶ 72. It wrote "our records indicate that you have not provided us with acceptable evidence of windstorm insurance; therefore, in order to protect our collateral interest in the property, we have purchased windstorm coverage in accordance with the terms of your Deed of Trust/Mortgage. You are responsible for the cost of this insurance." *Id.* CIT told her:

---

[2] The court considers the actual letters referenced in the FAC because it refers to them extensively and in detail in forming the basis of the action. *See, e.g.*, *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) ("A court may, however, consider certain materials — documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice — without converting the motion to dismiss into a motion for summary judgment"); *Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007) ("[A] court may consider a writing referenced in a complaint but not explicitly incorporated therein if the complaint relies on the document and its authenticity is unquestioned.").

>The amount of coverage may be less than the value of
>your home or real and personal property, and as a result,
>you may be underinsured.  The cost of this insurance may
>be significantly more than the cost of insurance you can
>obtain on your own.  We and/or our affiliates may have
>received compensation in connection with the placement
>of the insurance described in this letter.

*Id.*  It also specifically told her that "The cost of this insurance will be charged to
the outstanding balance of your loan, and if there are insufficient funds in your line
of credit, arrangement must be made for repayment."  *Id.*  "The November 15,
2010 notice stated that the annual premium for the force placed windstorm policy
was $10,086.96 — more than twenty times more expensive than Plaintiff's hazard
policy with First Fire and Casualty Company which provided windstorm and hail
coverage."  *Id.* (emphasis omitted).  "The accompanying 'Evidence of Wind
Insurance' for the force placed windstorm policy was obtained from Defendants
[Certain Underwriters of Lloyd's, London; and Great Lakes Reinsurance (UK),
PLC], both surplus lines insurance providers which are not required to file their
rates with the state insurance departments."  *Id.*  (This Order refers to Certain
Underwriters of Lloyd's, London as "Lloyd's"; to Great Lakes Reinsurance (UK),
PLC as "Great Lakes;" and sometimes refers to them collectively as "the Insurer
Defendants.").

>In the November 15, 2010 notice, Financial Freedom
>represented that the Effective Date for the force placed

windstorm policy placed on Plaintiff's property was
February 15, 2010 through February 15, 2011. Financial
Freedom thus had backdated the force placed windstorm
policy by nine months to cover a period of time which
had already passed during which there was no damage to
Plaintiff's Property and no claims had been made.
Moreover, on October 19, 2010, Plaintiff had provided
Financial Freedom with evidence of her hazard insurance
policy which included windstorm coverage.

*Id.* ¶ 73.

On December 2, 2010, Financial Freedom partially
cancelled the force placed windstorm policy for coverage
on Plaintiff's property from February 15, 2010 through
February 15, 2011. On December 7, 2010, Financial
Freedom cancelled this force placed windstorm policy in
full and restored Plaintiff's account balance to zero.

*Id.* ¶ 74.

Similar interactions occurred between Wieck and CIT in 2013 and

2015, where hurricane coverage was placed on Wieck's property (with similarly-

worded notices) and where allegedly excessively high and unnecessary premiums

charged to her were eventually "refunded." *Id.* ¶¶ 75-87. These interactions all

also involved the Insurer Defendants and Defendant Seattle Specialty Insurance

Services, Inc. ("Seattle Specialty"), which is "an intermediate insurance broker."

*Id.* ¶ 27. "Seattle Specialty provides force placed insurance and insurance tracking

services to mortgage servicers." *Id.* ¶ 8.

Since April 2013, Plaintiff has actively attempted to resolve with Financial Freedom the wrongful charges to her reverse mortgage from the backdated, excessively priced and unnecessary force placed wind policy which Financial Freedom placed on her property in March 2013, but which was backdated to cover the period December 10, 2011 through December 10, 2012. Towards this end, Plaintiff has engaged the services of Sandy Jolley, a reverse mortgage suitability and abuse consultant who has provided testimony to the Federal Reserve Board in Los Angeles concerning the wrongful acts of Financial Freedom, its prior parent company, OneWest, and its current parent company, CIT Bank, N.A.

*Id.* ¶ 88. And,

Since April 2013, Plaintiff has maintained [an] additional Standalone Hurricane policy with Zephyr, even though this additional insurance coverage was not required by her reverse mortgage. The annual premium on the Zephyr policy is approximately $600 — a fraction of the $10,362 in annual premiums which Financial Freedom charged to Plaintiff's reverse mortgage for the force placed windstorm policy. Even though Plaintiff has, at all relevant times, maintained her hazard insurance policy with First Fire & Casualty Company which provides the same type of windstorm and hail coverage as the force placed windstorm policy, Plaintiff has renewed the additional and unnecessary standalone hurricane insurance from Zephyr each year solely in an attempt to avoid foreclosure proceedings from Financial Freedom.

*Id.* ¶ 87.

///

///

### 3.    *The Alleged Wrongdoing*

The FAC alleges that Defendants committed unlawful practices in servicing Wieck's mortgage. *See, e.g.*, *id.* ¶¶ 2-3. In particular, Wieck contends that the premiums for LPI are unconscionably high not because of their actual cost, but because Financial Freedom has an exclusive relationship with Seattle Specialty to place insurance with Lloyd's and Great Lakes in exchange for unearned "commissions" and low cost or no cost loan tracking and monitoring services from Seattle Specialty. *Id.* ¶ 3. "Seattle Specialty receives a commission from Lloyd's and Great Lakes as a percentage of the total net written premium of force placed policies on the Financial Freedom loan portfolio, a portion of which Seattle Specialty then kickbacks to Financial Freedom[.]" *Id.* "These kickbacks are directly tied to the price of the force-placed insurance policies and are usually a percentage of the total net written premium of a policy." *Id.* ¶ 27. "This arrangement provides the mortgage servicer with an incentive to purchase the highest priced force-placed insurance policy that it can because the higher the cost of the insurance policy, the higher the commission or kickback to the mortgage servicer." *Id.* ¶ 28. CIT also improperly places "retroactive or backdated force placed insurance policies on Plaintiff and other borrowers' properties to cover

periods of time which have passed and during which the property was not damaged and no claims were made[.]" *Id.*¶ 3.

The FAC alleges that CIT, in concert with the other Defendants, failed to properly disclose costs and made material misrepresentations to Wieck about these costs when notifying her of the placing of insurance. "When a mortgage servicer notifies a borrower that a force-placed insurance policy has been secured and retroactively placed on the borrower's property, the mortgage servicer routinely fails to disclose the profits or financial windfalls it has derived as a result, and at the borrower's expense. Rather, the mortgage servicer falsely informs the borrower that they are only being charged for the actual 'cost' of the insurance." *Id.* ¶ 31. "Defendants have chosen insurance policies with excessively priced insurance premiums because of the benefits inuring to Defendants." *Id.* ¶ 34. "These policies violate the mortgage contract because they exceed the cost of the services and are not reasonable or appropriate to protect the note holder's interest in the property and rights under the security instrument." *Id.*

More specifically, the FAC alleges that:

Upon information and belief, Financial Freedom has negotiated deals with Seattle Specialty and the surplus line force placed insurance providers, [Lloyd's & Great Lakes], whereby they receive a percentage of the cost of the total net written premium of the force-placed insurance policies purchased for the borrowers. This

> unearned commission or kickback structure encourages
> the Defendants to select the most expensive insurance
> policy, despite not having an interest in the insured
> collateral.

*Id.* ¶ 42.

And it alleges, on information and belief, that "Seattle Specialty

[provides] improper incentives, including low cost or below market loan tracking

and portfolio monitoring services to Financial Freedom as an additional incentive

to obtain the surplus lines force placed insurance policies through Seattle

Specialty." *Id.* ¶ 43. "Third party vendors like Seattle Specialty are not authorized

to service reverse mortgages," *id*., and "[b]y outsourcing loan servicing and

insurance tracking to Seattle Specialty, Financial Freedom has skirted its duty to

adhere to federal regulations and compliance standards for reverse mortgage

servicing." *Id.* "Financial Freedom charges Plaintiff . . . the full amount of the

over-priced force placed insurance policy, despite being paid unearned

commissions, receiving below cost or discounted loan tracking services, and other

kickbacks from Seattle Specialty." *Id.* ¶ 44.

### 4. *CIT Forecloses on Wieck's Property*

In August of 2016, CIT filed a foreclosure complaint against Wieck.

*Id.* ¶ 104. The foreclosure stemmed from accumulated, unpaid charges for forced

place insurance. The FAC alleges:

> On or around July 1, 2015, Financial Freedom sent
> Plaintiff a "Property Charge Delinquency Letter" in
> which it demanded payment for the backdated force
> placed wind insurance policies in the amount of
> $13,497.99 for 16 months of "Hurricane Insurance"
> coverage from the period November 1, 2011 to
> March 31, 2013.  This letter was materially misleading
> and false because the EOI [("Evidence of Insurance")]
> indicated that the force placed policy was for windstorm
> and hail coverage, not "hurricane' insurance."

*Id.* ¶ 92.  Wieck responded (though Jolley) and received certain responses back

from Financial Freedom in 2015.  *Id.* ¶¶ 100-03.  Nevertheless, "[o]n or around

May 24, 2016, Plaintiff received a notice that her loan had been referred to

foreclosure," *id.* ¶ 98, and "a foreclosure complaint was filed by CIT Bank, N.A.

against Plaintiff in the Second Circuit Court of the State of  Hawaii, in and for the

County of Maui.  The only reason Plaintiff's loan [was] in 'default' is because of

the wrongfully placed, excessively priced, duplicative, backdated and unlawful

force placed wind insurance."  *Id.* ¶ 104.

Thereafter, the coverage dispute that led to the foreclosure was

resolved, and the foreclosure proceeding was closed:

> On October 28, 2016, Zephyr issued Plaintiff a
> Standalone Hurricane policy for the period November 30,
> 2011 through November 30, 2012.  Financial Freedom
> was provided with a copy of the policy.  On November 2,
> 2016, Financial Freedom verbally represented that it
> would reverse the $13,497.99 in force placed insurance
> charges on Plaintiff's loan and dismiss the foreclosure

> proceedings against Plaintiff. A notice of dismissal
> without prejudice was filed on November 30, 2016 in the
> foreclosure proceeding against Ms. Wieck. To Plaintiff's
> knowledge, the charges to her mortgage account resulting
> from the force placed insurance have yet to be reversed
> in full.

*Id.* ¶ 105. Meanwhile, on November 4, 2016, Wieck filed the initial Complaint in

this action. ECF No. 1.

The foreclosure proceedings, however, led to an allegedly

unnecessary property inspection of Wieck's residence right before she had filed

suit. Specifically,

> Several days prior to obtaining the Zephyr policy, on
> October 24, 2016, at 11:15 a.m. Plaintiff was startled at
> her residence by a tall, thin, white man who had
> surmounted the six foot fence with a locked gate which
> surrounds Plaintiff's property, as well as the locked
> grillwork gate at the foot of the stairs leading to
> Plaintiff's front door and lanai. This strange man was on
> Plaintiff's lanai, peering into Plaintiff's home. Plaintiff
> yelled at the man, stating "Stop right there. How dare
> you enter my property." The man took a picture of
> Plaintiff's home and leapt over the fence.

*Id.* ¶ 106. On November 28, 2016, CIT "informed Plaintiff that because a third

party vendor of Financial Freedom had reported her property to be vacant on

October 20, 2016, Financial Freedom submitted a request to HUD to call her

reverse mortgage loan immediately 'due and payable.'" *Id.* ¶ 107. According to

Wieck,

> There is absolutely no reason for Financial Freedom to
> have ordered an inspection of Ms. Wieck's property, or
> for its third party vendor to report that the property was
> vacant. Ms. Wieck has been in constant verbal and
> written communication with Financial Freedom since her
> loan was originally charged for force placed insurance.
> Moreover, Ms. Wieck has certified numerous times to
> Financial Freedom, both verbally and in writing, that she
> has continuously occupied the property as her primary
> residence.

*Id.* ¶ 108. And "Financial Freedom charged Plaintiff a $30 inspection fee for the

unwarranted October 2016 inspection." *Id.* ¶ 109.

**B.     Procedural Background**

After the initial Complaint on November 4, 2016, Wieck filed the

FAC on January 11, 2017. ECF No. 15. The FAC alleges the following Counts:

- Count One (Breach of Contract) against CIT.

- Count Two (Breach of Implied Covenant of Good Faith and Fair
  Dealing) against CIT.

- Count Three (Violations of Hawaii Revised Statute ("HRS") § 480-2)
  against CIT.

- Count Four (Violations of HRS § 480-2) against Seattle Specialty and
  the Insurer Defendants.

- Count Five (Tortious Interference with Business Relationship) against
  Seattle Specialty and the Insurer Defendants.

- Count Six (Violations of Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c) against all Defendants.

- Count Seven (Violation of RICO, 18 U.S.C. 1962(d) (conspiracy) against all Defendants.

- Count Eight (Violations of the Truth in Lending Act, 15 U.S.C. §§ 1601 et seq. against CIT.

After several stipulations extending the time to respond to the FAC, ECF Nos. 46, 47, 48, three separate Motions to Dismiss were filed by CIT, Seattle Specialty, and the Insurer Defendants. ECF Nos. 55, 56, 59. Oppositions were filed on August 7, 2017, ECF Nos. 66, 68, & 69, along with Plaintiff's Motion Requesting Judicial Notice of Official Government Reports. ECF No. 67. Corresponding Replies were filed on August 21, 2017. ECF Nos. 71, 73 & 74. The Motions were heard on September 11, 2017.

Following the hearing, supplemental briefing by CIT was filed on September 25, 2017, ECF No. 85, and September 26, 2017, ECF No. 86. An Opposition was filed by Plaintiff on October 10, 2017, ECF No. 87, with a Reply by CIT on October 17, 2017, ECF No. 88. Further supplemental briefing was filed by Plaintiff and CIT on March 23, 2018. ECF Nos. 94, 95.

///

///

# III. **STANDARDS OF REVIEW**

## A.     **Rule 12(b)(1)**

A Rule 12(b)(1) motion challenging subject matter jurisdiction may be either facial or factual. *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction. By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Id.*

If a movant "has converted the motion to dismiss into a factual motion by presenting affidavits or other evidence properly brought before the court, the party opposing the motion must furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction." *Id.* (quoting *Savage v. Glendale Union High Sch.*, 343 F.3d 1036, 1039 n.2 (9th Cir. 2003)). "In evaluating the evidence, the court 'need not presume the truthfulness of the plaintiffs' allegations.'" *Edison v. United States*, 822 F.3d 510, 517 (9th Cir. 2016) (quoting *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000)). "Any factual disputes, however, must be resolved in favor of Plaintiffs." *Id.* (citing *Dreier v. United States,* 106 F.3d 844, 847 (9th Cir. 1996)). That is, the court "will consider items outside the pleading . . . but resolve all disputes of fact in favor of the non-

movant." *Dreier*, 106 F.3d at 847. "[T]he standard . . . is similar to the summary judgment standard[.]" *Id.*

## B.     Rule 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) permits a motion to dismiss for "failure to state a claim upon which relief can be granted[.]" A Rule 12(b)(6) dismissal is proper when there is either a "'lack of a cognizable legal theory or the absence of sufficient facts alleged.'" *UMG Recordings, Inc. v. Shelter Capital Partners, LLC*, 718 F.3d 1006, 1014 (9th Cir. 2013) (quoting *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990)).

Although a plaintiff need not identify the legal theories that are the basis of a pleading, *see Johnson v. City of Shelby, Mississippi*, 135 S. Ct. 346, 346 (2014) (per curiam), a plaintiff must nonetheless allege "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This tenet — that the court must accept as true all of the allegations contained in the complaint — "is inapplicable to legal conclusions." *Id.* Accordingly, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555); *see also Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011) ("[A]llegations

in a complaint or counterclaim may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively.").

Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). In other words, "the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr*, 652 F.3d at 1216. Factual allegations that only permit the court to infer "the mere possibility of misconduct" do not show that the pleader is entitled to relief as required by Rule 8. *Iqbal*, 556 U.S. at 679.

## IV. <u>DISCUSSION</u>

### A. **Wieck has Standing to Bring LPI and Foreclosure-Related Claims**

Defendants argue that Wieck lacks standing to bring claims "to the extent they are based on LPI and wrongful foreclosure." CIT Mot. at 7; *see also* Seattle Mot. at 8-9; Lloyd's Mot. at 10. They contend that it is undisputed that all premiums and interest charged to Wieck in connection with LPI were refunded

before Wieck filed suit on November 4, 2016, and therefore, she has suffered no "injury in fact" for purposes of Article III standing. The court disagrees.

Under the Constitution, the court's judicial power is limited to "Cases" or "Controversies." U.S. Const. art. III §2. This limitation requires a plaintiff to demonstrate "the irreducible constitutional minimum of standing." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Such standing requires three elements: "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citations omitted). And *Spokeo* reiterated that an "injury in fact" must be both "concrete *and* particularized," where "concrete" injury must be "real" and "not abstract." *Id.* at 1548 (quotation marks omitted). Further, "standing is determined as of the commencement of litigation." *Yamada v. Snipes,* 786 F.3d 1182, 1203 (9th Cir. 2015) (quoting *Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1171 (9th Cir. 2002) (brackets omitted)); *see also Lujan*, 504 U.S. at 569 n.4 ("The existence of federal jurisdiction ordinarily depends on the facts as they exist when the complaint is filed.") (quoting *Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 839 (1989)).

In support of the argument that Wieck had suffered no concrete injury when suit was filed, CIT proffers evidence, including a declaration from Gail Balettie, a senior CIT vice president, attesting:

> 28. . . . Plaintiff was sent two letters from Financial Freedom dated November 1, 2016, which stated that the insurance Financial Freedom had placed on the Property for the periods December 10, 2011 through December 10, 2012, and December 10, 2012 through April 1, 2013 had been cancelled, and that she had not been charged the premiums associated with those policies. . . .

> 29. In November 2016, Plaintiff was fully refunded the $10,362.27 premium that was charged to Plaintiff's account on March 4, 2013 for the insurance placed on the Property for the period December 10, 2011 through December 10, 2012. At the same time, Plaintiff also received a full refund of the interest (totaling $893.06) that had been charged to her account in connection with the placement of insurance for this period.

> 30. A charge of $3,135.72 (reflecting the cost of lender-placed insurance for the period December 10, 2012 through April 1, 2013) was removed from Plaintiff's account on November 4, 2016. Plaintiff thus received a complete and full refund of the $10,220.72 premium that was charged to Plaintiff's account on April 10, 2013 for the insurance placed on the Property for the period December 10, 2012 through December 10, 2013.

Balettie Decl. ¶¶28-30, ECF No. 55-2.[3]  Defendants emphasize that they are

making a factual (not a facial) attack on jurisdiction under Rule 12(b)(1), and thus

"[t]he court need not presume the truthfulness of the plaintiff's allegations." *Safe*

*Air for Everyone*, 373 F.3d at 1039 (citation omitted).  Wieck did not proffer any

evidence to contradict Balettie's or Carruthers' declarations.  Defendants thus

argue that it is conclusively established that Wieck had suffered no concrete and

particularized injury under *Spokeo* when suit was filed because it is undisputed that

she had been fully "refunded" any allegedly wrongful LPI charges and related

interest.

　　　　　Defendants' argument fails because the evidence does not

affirmatively establish that Wieck lacks standing.  Even unchallenged, it is far

from clear from the proffered evidence that Wieck was made completely whole —

prior to the filing of the Complaint — for all LPI and foreclosure-related

premiums, expenses, and alleged damages.  For example, Balettie only proffers

*letters* dated November 1, 2016, stating that the LPI policies were cancelled and

that Wieck had not been charged premiums associated with those policies.  Balettie

Decl. ¶ 28, ECF No. 55-2.  But it is undisputed that Wieck had a prior outstanding

---

[3]  Seattle Specialty offers a similar declaration from a vice president of lender placed products for an affiliate, National General Management Corporation.  ECF No. 56-2, Helen Carruthers Decl. ¶ 2.

balance of $13,497.00 on her account for those policies, *id.* ¶ 26, and it is unclear

exactly when that *total* amount was actually "refunded" (that is, whether before or

after suit was filed). *See id.* ¶ 29 (stating that Wieck was "fully refunded" a

$10,362.27 premium "[i]n November 2016") & ¶ 30 (stating that a charge of

$3,135.72 "was removed from Plaintiff's account on November 4, 2016"). In

evaluating Balettie's statements, the court is still required to resolve questions of

fact in favor of Plaintiff. *Edison*, 822 F.3d at 517.[4]

More important, the Declarations do not address foreclosure-related

damages — CIT does not presently contest that (1) on August 8, 2016, CIT filed a

foreclosure complaint in state court based on the accrued LPI charges, FAC ¶ 104;

and (2) the foreclosure complaint remained pending at least until November 30,

2016 (after suit was filed), *id.* ¶ 105. And Wieck seeks additional damages and

costs — which remain at issue even if premiums and interest were "refunded" —

related to defending against this foreclosure, as well as expenses for having

"engaged the services of Sandy Jolley, a reverse mortgage suitability and abuse

---

[4] The court applies a test "similar to the summary judgment standard," *Dreier*, 106 F.3d at 847, and it is well-settled that "[s]ummary judgment may be resisted and must be denied on no other grounds than that the movant has failed to meet its burden of demonstrating the absence of triable issues." *Martinez v. Stanford*, 323 F.3d 1178, 1182 (9th Cir. 2003) (quoting *Henry v. Gill Indus., Inc.*, 983 F.2d 943, 950 (9th Cir. 1993)). Under this standard, the motion may be denied "where the movant's papers are themselves insufficient to support a motion for summary judgment or on their face reveal a genuine issue of material fact." *Id.* (quoting *Henry*, 983 F.2d at 949).

consultant," *id.* ¶ 88, to resolve the allegedly wrongful LPI charges. Defendants also do not contest that an alleged $30 inspection fee related to the foreclosure has not been tendered to Wieck. *Id.* ¶ 109.[5]

Furthermore, Wieck alleges claims for violations of Hawaii's unfair or deceptive trade practices statutes, HRS chapter 480. "Hawaii courts have not set a high bar for proving [either 'injury' or 'damages']. The plaintiff must show only that the alleged violations of section 480-2(a) caused private damage, and that the plaintiff's injury is fairly traceable to the defendant's actions." *Compton v. Countrywide Fin. Corp.*, 761 F.3d 1046, 1053 (9th Cir. 2014) (citations and internal quotation marks omitted). The chapter includes potential statutory or

_____

[5] Some cases have indeed dismissed complaints for lack of standing based on a pre-suit refund. *See Johnson v. Bobcat Co.*, 175 F. Supp. 3d 1130, 1137 (D. Minn. 2016) ("[W]hen a defendant offers a plaintiff a full refund for all of its alleged loss prior to the commencement of litigation, this refund offer deprives the plaintiff of Article III standing because the plaintiff cannot establish an injury in fact.") (citing cases). But this proposition does not apply where, as here, a plaintiff also seeks consequential and other related damages. *See id.* ("Although the Court is persuaded that a pre-litigation refund offer for complete relief could potentially deprive a plaintiff of Article III standing, the Court finds — based on the facts alleged in the complaint — that no such offer was made here. [Plaintiff] sought reimbursement not only for the cost of the new loader, but also for all consequential and incidental damages resulting from [defendant's] alleged misconduct."); *see also, e.g.*, *Anderson v. Elmhurst Chevrolet, Inc.*, 2004 WL 2038170, at *4 (N.D. Ill. Sept. 2, 2004) (refusing to dismiss a case on mootness grounds where defendant offered plaintiff a full refund prior to filing of suit, reasoning that defendant "did not refund or make any offer to compensate plaintiff for reasonable attorney's fees. . . [nor] offer to pay other losses, costs, and expenses incurred by plaintiff").

It is also relevant that Wieck is nominally the lead plaintiff in a putative class action, and courts have been skeptical of "defense effort[s] to pretermit a proposed class action by picking off the named plaintiff's claim." *Laurens v. Volvo Cars of N. Am., LLC*, 868 F.3d 622, 623 (7th Cir. 2017) (concluding that an unaccepted offer of a full refund *before* a putative plaintiff files a lawsuit does not deprive that plaintiff of standing, and reviewing other similar circumstances).

treble damages, even where actual damages might otherwise be considered minimal (although still "concrete"). *See* HRS § 480-13(b)(1) (allowing for statutory damages of "not less than $1,000 or threefold damages," or "a sum not less than $5,000 or threefold any damages" if a plaintiff is an elder); §480-13.5 (allowing for a civil penalty not to exceed $10,000 for each violation for violations committed against elders); *Zanakis-Pico v. Cutter Dodge, Inc.*, 98 Haw. 309, 317, 47 P.3d 1222, 1230 (2002) ("If a consumer can establish a resulting injury, HRS § 480-13(b)(1) entitles him or her to the greater of $1,000.00 or treble damages."). The suit also seeks injunctive relief to keep "Defendants from continuing the acts and practices described [in the FAC]." FAC at 72. Although *Spokeo* reiterated that "concrete" injury must be "real" and "not abstract," 136 S. Ct. at 1548, it also recognized that some intangible injuries can still be concrete. *Id.* at 1549-50.

In short, Wieck seeks enough damages and other relief to support having standing to bring LPI and foreclosure-related claims. Whether her claims might otherwise fail does not mean there is no standing to assert them. *See Bernhardt v. Cty. of L.A.*, 279 F.3d 862, 868 n.4 (9th Cir. 2002) ("Whether a party has standing is distinct from whether she has asserted a cause of action.") (citation omitted).

**B.     Preemption Under the Home Owners' Loan Act of 1933 ("HOLA")**

CIT argues that Wieck's state-law claims against it (breach of

contract, violations of HRS chapter 480) are preempted by HOLA, which has

implementing regulations that the Ninth Circuit describes as "so pervasive as to

leave no room for state regulatory control." *Campidoglio LLC v. Wells Fargo &*

*Co.*, 870 F.3d 963, 971 (9th Cir. 2017) (quoting *Silvas v. E\*Trade Mortg. Corp.*,

514 F.3d 1001, 1004-05 (9th Cir. 2008)).  Despite this pervasiveness, however,

"HOLA does not preempt all state laws." *Id.*  Determining which laws survive

requires a complex analysis on an as-applied basis.  *Id.* at 972.  The court begins by

explaining the necessary background and framework for considering the

arguments.

**1.     *HOLA's Preemption Analysis***

"Congress enacted [HOLA] to charter savings associations under

federal law, at a time when record numbers of home loans were in default and a

staggering number of state-chartered savings associations were insolvent." *Silvas*,

514 F.3d at 1004.  "HOLA empowered the regulatory body, which became the

OTS [(Office of Thrift Supervision)], to authorize the creation of federal savings

and loan associations, to regulate them, and, by its regulations, to preempt

conflicting state law." *Campidoglio*, 870 F.3d at 971 (citing *Fidelity Fed. Sav. &*

*Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 161-62 (1982)).  To that end, in 1996,

OTS promulgated 12 C.F.R. § 560.2 — a comprehensive regulation that occupies

the field of lending regulations of federal savings associations.  *Silvas*, 514 F.3d at

1004-05.  Specifically, § 560.2(a) provides in pertinent part:

> OTS hereby occupies the entire field of lending
> regulation for federal savings associations.  OTS intends
> to give federal savings associations maximum flexibility
> to exercise their lending powers in accordance with a
> uniform federal scheme of regulation.  Accordingly,
> federal savings associations may extend credit as
> authorized under federal law, including this part, without
> regard to state laws purporting to regulate or otherwise
> affect their credit activities, except to the extent provided
> in paragraph (c) of this section . . . .  For purposes of this
> section, "state law" includes any state statute, regulation,
> ruling, order or judicial decision.

*Id.*  Paragraph (b) then lists "[i]llustrative examples" of "the types of state laws

preempted by paragraph (a)," which "include, without limitation, state laws

purporting to impose requirements regarding" the following:

> (1) Licensing, registration, filings, or reports by creditors;
>
> (2) The ability of a creditor to require or obtain private
> mortgage insurance, insurance for other collateral, or
> other credit enhancements;
> . . . .
> (4) The terms of credit, including amortization of loans
> and the deferral and capitalization of interest and
> adjustments to the interest rate, balance, payments due, or
> term to maturity of the loan, including the circumstances
> under which a loan may be called due and payable upon

the passage of time or a specified event external to the loan;

(5) Loan-related fees, including without limitation, initial charges, late charges, prepayment penalties, servicing fees, and overlimit fees;

(6) Escrow accounts, impound accounts, and similar accounts;
. . . .
(9) Disclosure and advertising, including laws requiring specific statements, information, or other content to be included in credit application forms, credit solicitations, billing statements, credit contracts, or other credit-related documents and laws requiring creditors to supply copies of credit reports to borrowers or applicants;

(10) Processing, origination, servicing, sale or purchase of, or investment or participation in, mortgages;

(11) Disbursements and repayments;
. . . .

*Id.* § 560.2(b).

Next, paragraph (c) of the regulation lists types of state laws that are *not* preempted, at least "to the extent that they only incidentally affect the lending operations of Federal savings associations or are otherwise consistent with the purposes of paragraph (a) of this section." *Id.* § 560.2(c). The list includes state "[c]ontract and commercial law," *id.* § 560.2(c)(1); "[t]ort law," *id.* § 560.2(c)(4); and "[a]ny other law that OTS, upon review, finds: (i) Furthers a vital state interest; and (ii) Either has only an incidental effect on lending operations or is not

otherwise contrary to the purposes expressed in paragraph (a) of this section," *id.*
§ 560.2(c)(6).

In adopting § 560.2(c), OTS explained that "OTS wants to make clear that it does not intend to preempt basic state laws such as state uniform commercial codes and state laws governing real property, contracts, torts, and crimes," OTS, Final Rule, 61 Fed. Reg. 50951-01, 50966 (Sept. 30, 1996), and that "the purpose of paragraph (c) is to preserve the traditional infrastructure of basic state laws that undergird commercial transactions, not to open the door to state regulation of lending by federal savings associations." *Id.*

Courts follow a three-step process outlined by OTS to analyze whether HOLA preempts a state law:

> [T]he first step will be to determine whether the type of law in question is listed in paragraph (b). If so, the analysis will end there; the law is preempted. If the law is not covered by paragraph (b), the next question is whether the law affects lending. If it does, then, in accordance with paragraph (a), the presumption arises that the law is preempted. This presumption can be reversed only if the law can clearly be shown to fit within the confines of paragraph (c). For these purposes, paragraph (c) is intended to be interpreted narrowly. Any doubt should be resolved in favor of preemption.

*Silvas*, 514 F.3d at 1005 (quoting 61 Fed. Reg. at 50966-67).[6] "In conducting this analysis, [courts] are not limited to assessing whether the state law on its face comes within paragraph (b) of the regulation. Instead, [courts] ask whether the state law, 'as applied, is a type of state law contemplated in the list under paragraph (b). . . . If it is, the preemption analysis ends.'" *Campidoglio*, 870 F.3d at 971-72 (quoting *Silvas*, 514 F.3d at 1006).[7]

---

[6] HOLA's preemption provisions were repealed, effective July 21, 2011, by the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 11-203, 124 Stat. 1376 (July 21, 2010) ("Dodd-Frank"). *See* 75 Fed. Reg. 57252-02 (establishing July 21, 2011 as Dodd-Frank's "designated transfer date" under 12 U.S.C. § 5582). But HOLA remains applicable because the repeal was not retroactive, and thus it can still preempt claims arising from mortgages obtained before the repeal (such as Wieck's, which was signed in November 2006, ECF No. 15-1 at 9). *See, e.g.*, *McCauley v. Home Loan Inv. Bank, F.S.B.*, 710 F.3d 551, 554 n.2 (4th Cir. 2013) (explaining that Dodd-Frank's abolition of HOLA's relevant regulations was not retroactive, and so "[b]ecause 12 C.F.R. § 560.2 was in effect when the loan contract was entered into, it governs here"); *Meyer v. OneWest Bank, F.S.B.*, 91 F. Supp. 3d 1177, 1180-81 (C.D. Cal. 2015) ("The Dodd-Frank Act is not, however, retroactive. Contracts formed before the Act's effective date are, therefore, subject to the preemption rules applicable at the time of formation.") (citations omitted).

[7] Given Dodd-Frank, Wieck argues that *Silvas's* preemption analysis does not apply at all because Dodd-Frank added 12 U.S.C. § 1465 (entitled "State law preemption standards for Federal savings associations clarified"), which includes a section providing "[n]otwithstanding the authorities granted under sections 1463 and 1464 of this title, this chapter does not occupy the field in any area of State law." *Id.* § 1465(b). She argues that Congress' statutory "clarification" means the OTS lacked authority to occupy the field by regulation when it did so with 12 C.F.R. § 560.2.

The court disagrees that this aspect of Dodd-Frank effectively overruled *Silvas* — Dodd-Frank also enacted a section that "makes clear that the Act does not apply to contracts entered into before the Act's enactment." *Copeland-Turner v. Wells Fargo Bank*, 800 F. Supp. 2d 1132, 1137 (D. Or. 2011) (rejecting the argument that "as a result of [Dodd-Frank], the *Silvas* analysis and preemption arguments based on 12 C.F.R. § 560.2, no longer apply"). Specifically, 12 U.S.C. § 5553 provides:

(continued . . .)

## 2. *Preemption Depends on the Status of the Financial Institution*

It's important to keep in mind that HOLA applies to federal savings and loan associations (not to national banking associations, which are covered by the National Banking Act). This could complicate the preemption analysis, where a loan changes hands from a savings and loan to a national bank, or where — as is the case here — an institution changes its charter. Here, Wieck obtained her mortgage from Financial Freedom Senior Funding Corporation, then a division of IndyMac Bank, FSB (a predecessor to OneWest Bank FSB, and a federal savings bank to which HOLA applies). But OneWest Bank changed its charter from a federal savings bank to a national banking association on February 28, 2014, after which it was eventually renamed CIT Bank, N.A. *See* Balettie Decl. ¶ 5, ECF No.

---

(. . . continued)

> This title, and regulations, orders, guidance, and interpretations prescribed, issued, or established by the Bureau, shall not be construed to alter or affect the applicability of any regulation, order, guidance, or interpretation prescribed, issued, and established by the Comptroller of the Currency or the Director of the Office of Thrift Supervision regarding the applicability of State law under Federal banking law to any contract entered into on or before July 21, 2010, by national banks, Federal savings associations, or subsidiaries thereof that are regulated and supervised by the Comptroller of the Currency or the Director of the Office of Thrift Supervision, respectively.

*Id.* This section specifically states that Dodd-Frank's changes "were not to affect the applicability of any regulation regarding any contract entered into on or before July 21, 2010." *Copeland-Turner*, 800 F. Supp. 2d at 1138. And appellate courts have continued to apply Silvas's analysis well past Dodd-Frank's implementation. *See, e.g.*, *Campidoglio*, 870 F.3d at 971-72.

55-2.  And "[w]hether, and to what extent, HOLA applies to claims against a national bank when that bank has acquired a loan executed by a federal savings association is an open question in [the Ninth Circuit]."  *Campidoglio*, 870 F.3d at 971.

Many district courts have found that national banking institutions may assert HOLA preemption if the subject loans were originated by savings associations.  *See, e.g.*, *Stewart v. Wells Fargo Bank*, N.A., 2014 WL 12586072, at *4 (C.D. Cal. Dec. 1, 2014) (concluding that "successors in interest . . . may properly assert preemption under the HOLA even if the successor entity is not a federally charted saving institution") (citing cases); *Heagler v. Wells Fargo Bank, N.A.*, 2017 WL 1213370, at *4 (E.D. Cal. Mar. 31, 2017) ("HOLA preemption attaches to the loan.") (citing cases).  But many courts conclude otherwise.  *See, e.g.*, *Pimentel v. Wells Fargo, N.A.*, 2015 WL 2184305, at *3 (N.D. Cal. May 7, 2015)  ("[C]laims against a national bank based on conduct occurring before its merger with a federally charted savings bank are preempted [by HOLA], while claims based on the bank's own conduct after the merger are not preempted.") (citing cases); *Rijhwani v. Wells Fargo Home Mortg., Inc.*, 2014 WL 890016, at *7 (N.D. Cal. Mar. 3, 2014) ("HOLA preemption [applies] only to *conduct occurring before* the loan changed hands from the federal savings association or bank to the

entity not governed by HOLA.") (citing cases). And "there is a growing divide in the district courts' treatment of this issue." *Kenery v. Wells Fargo, N.A.*, 2014 WL 129262, at *4 (N.D. Cal. Jan. 14, 2014) (citing *Leghorn v. Wells Fargo Bank, N.A.*, 950 F. Supp. 2d 1093 (N.D. Cal. 2013)). Whether, or to what extent, this court needs to reach this issue depends on whether HOLA preemption applies at all, a question the court turns to next.

### 3.    *Application to Breach of Contract Claim (Count One)*

Count One alleges that CIT breached the following provision in the mortgage agreement:

> If Borrower fails to make . . . the property charges
> required by Paragraph 2 [regarding "fire, flood and other
> hazard insurance"] . . . *then Lender may do and pay*
> *whatever is necessary to protect the value of the Property*
> *and Lender's rights in the Property*, including payment
> of taxes, hazard insurance and other items mentioned in
> Paragraph 2.

FAC, Ex. A at 3, ECF No. 15-1 (emphasis added). Wieck's theory is that CIT breached this provision because (although conceding that CIT generally had a right to procure hurricane insurance to protect the property) it was not "necessary" for it to charge her for amounts well in excess of what was required (the actual cost of

insurance)[8] and for expenses unrelated to the insurance (such as unearned compensation or a portion of the premium paid to the insurer). She also alleges that it was not necessary for the forced-place insurance to be "backdated" or made "retroactive" to cover past periods of time during which no loss could have occurred because no hurricanes struck Hawaii during those periods. Further, she alleges it was not necessary to charge her a fee to inspect her property during the subsequent, wrongful, foreclosure process (as if the property was vacant) when she was still living in the property.

This breach of contract claim is not preempted. At the first step of the analysis — as applied to Wieck's mortgage contract — it is not a type of state-law claim contemplated in § 560.2(b) as "impos[ing] requirements" on lending. Such a claim, for example, would not impose requirements on CIT as to (1) licensing, (2) the ability to require or obtain private mortgage insurance, (3) the terms of credit, (4) disclosure and advertising, or (5) loan processing. Instead, "it is the parties' own agreement, rather than [Hawaii] state law, that imposes any requirements on [CIT]." *Campidoglio*, 870 F.3d at 972 (holding that a particular

---

[8] The FAC alleges that the insurance placed on Wieck's property was "twenty times more expensive than comparable insurance obtained on the open market." FAC ¶ 24. It further alleges that the mortgage servicer (CIT) has "an incentive to purchase the highest price forced-placed insurance policy that it can because the higher the cost of the insurance policy, the higher the commission or kickback to the mortgage servicer." *Id.* ¶ 28.

breach-of-contract claim under Washington law regarding contractual interest rates in a mortgage loan was not preempted by HOLA). That is, the claim "seeks to impose only the state law requirement that [CIT] honor a contractual promise made by its predecessor-in-interest." *Id.*

It's true that, at the most general level, questioning an LPI premium might relate to "insurance for other collateral," under § 560.2(b)(2), or a "loan related fee" under § 560.2(b)(5). But, as even CIT emphasizes, the court is not limited to considering whether the state law "on its face comes within paragraph (b) of the regulation." *Campidolgio*, 870 F.3d at 971-72. Rather, the court analyzes "whether the state law, 'as applied, is a type of state law contemplated in the list under paragraph (b).'" *Id.* at 972. Doing so, Wieck's breach of contract claim would not impose any new requirement on CIT — instead, "it is the contract, not the law, that regulates [CIT's] conduct." *Id.*; *see also, e.g.*, *Barzelis v. Flagstar Bank, F.S.B.*, 784 F.3d 971, 974-75 (5th Cir. 2015) (distinguishing "between breach-of-contract claims based on provisions of the [security] agreement and those based on independent statutory obligations," and holding that HOLA did not preempt "breach-of-contract claims based on the parties' voluntary agreement"); *Tinsley v. OneWest Bank, F.S.B.*, 4 F. Supp. 3d 805, 824-25 (S.D. W. Va. 2014) (concluding that "Plaintiff's first claim [regarding force-placed insurance] properly

alleges a breach of contract, in that the claim arises out of the Deed of Trust and does not attack any of Defendant's underlying policies or practices," and finding no HOLA preemption); *Sovereign Bank v. Sturgis*, 863 F. Supp. 2d 75, 94 (D. Mass. 2012) ("[C]ourts have regularly held that when a federally chartered bank violates a specific clause of a mortgage contract, HOLA will not preempt the resulting breach of contract claim.") (citing cases).

At the next steps, although Wieck's breach-of-contract claim would likely "affect" lending — leading to a presumption of preemption in accordance with § 560.2(a) — it fits squarely within the "[c]ontract and commercial law" exception under § 560.2(c)(1), and would only incidentally affect lending operations. *See, e.g.*, *Molosky v. Wash. Mut., Inc.*, 664 F.3d 109, 116 (6th Cir. 2011) ("Lending practices cannot be more than incidentally affected by claims that 'merely seek to make defendants live up to the word of their agreements they sign with their customers.'") (quoting *McAnaney v. Astoria Fin. Corp.,* 665 F. Supp. 2d 132, 164 (E.D.N.Y. 2009) (brackets omitted)). "[A] breach of contract claim which, as here, does not purport to impose additional terms on a contract, but only to hold federal savings and loan associations to 'the basic norms that undergird commercial transactions,' only incidentally affects lending operations, and so is not preempted." *Id.* (quoting Preemption of State Laws Applicable to Credit Card

Transactions, OTS Op. Letter (Dec. 24, 1996), at 10, 1996 WL 767462 at *5 ("1996 OTS Opinion")). As *Campidoglio* reasoned, "because the [breach of contract] law 'can clearly be shown to fit within the confines of paragraph (c) [of § 560.2],' HOLA does not preempt it." 870 F.3d at 972-73 (quoting *Silvas*, 514 F.3d at 1005).

### 4. *Application to Unfair or Deceptive Acts or Practices Claims (HRS chapter 480) Against CIT (Count Three)*

CIT next contends that HOLA preempts Wieck's HRS chapter 480 claims.[9] It argues that the chapter 480 claims are covered by § 560.2(b) and would impose requirements on lending by, for example, (1) requiring it to disclose insurance costs, (2) changing the manner in which it procures and places insurance (and thereby services mortgages), (3) restricting its ability to enter agreements with insurance agents, and (4) affecting its ability to charge loan-related fees to borrowers. CIT Supp. Mem. at 13, ECF No. 86. The court agrees, but not fully. Some of the chapter 480 claims are preempted, some are not.

---

[9] In particular, HRS § 480-2(a) provides that "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful." In this regard, chapter 480 is a law of general application; it does not specifically target federal savings associations, much less specifically regulate lending practices, terms of credit, or interest rates.

In this Order, the court refers to different "claims" made in a single count for violating chapter 480, addressing the different bases for the alleged violations.

Preemption depends on the specific allegations of the FAC. To review, the FAC alleges that Financial Freedom (i.e., CIT) engaged in unfair or deceptive acts or practices by placing "unnecessary" insurance on her property, with "unreasonable and inflated premiums" that included "improper compensation through illegal kickback or captive reinsurance arrangements," which were charged to Wieck. FAC ¶¶ 143, 151. It focuses on "numerous misrepresentations and deceptive statements in the form notice letters drafted and sent by Seattle Specialty with the approval of Financial Freedom[.]" *Id.* ¶ 144. It claims, for example, that a March 6, 2013 notice from Financial Freedom was "materially false, misleading and deceptive and omitted material information." *Id.* ¶ 147. Financial Freedom represented that the "cost" of the LPI was $10,362.27, when that amount was not the actual cost, but included "extraneous kickbacks and other financial inducements shared among the Defendants and charged to Plaintiff." *Id.* ¶ 147b.

The FAC alleges the same type of affirmative misrepresentations and omissions as to an April 12, 2013 letter — Financial Freedom "failed to disclose" that the reason for a cost that was "twenty times" higher that comparable coverage "was because Financial Freedom had selected a significantly more expensive policy in order to receive kickbacks, reinsurance profits and other wrongful

benefits from Lloyd's, Great Lakes and Seattle Specialty." *Id.* ¶ 149. "Financial

Freedom deceived and misrepresented facts . . . in making these statements,

creating the impression that borrowers were being charged for the cost of the

necessary insurance coverage only." *Id.* ¶ 151.

In examining whether these types of misrepresentation or deceptive-

practice claims are preempted by HOLA, courts often distinguish between claims

for failure to disclose terms (which are preempted) and claims based on

misrepresentation or "affirmative deception" (which are not). *See, e.g.*, *McCauley*,

710 F.3d at 557 (reasoning that "[plaintiff's] complaint alleges an affirmative

deception by the issuer of her mortgage, an act outside the scope of § 560.2(b),"

and holding that a fraud claim is not preempted by HOLA). For example, in

*Barzelis*, the Fifth Circuit concluded that a misrepresentation claim based on

inadequate disclosures was preempted by HOLA, distinguishing a claim based on

affirmatively misrepresenting facts:

> Negligent misrepresentation — like fraud, intentional
> misrepresentation, and similar tort claims — relies on a
> generally applicable duty not to misrepresent material
> facts, and to that extent, the claim would typically not be
> preempted by HOLA. Yet courts have recognized that
> where a negligent-misrepresentation claim is predicated
> not on affirmative misstatements but instead on the
> inadequacy of disclosures or credit notices, it has a
> specific regulatory effect on lending operations and is
> preempted.

784 F.3d at 975-76 (citations omitted). *See also, e.g.*, *Susilo v. Wells Fargo Bank, N.A.*, 796 F. Supp. 2d 1177, 1186 (C.D. Cal. 2011) ("[P]laintiff's state law claims are based in part on affirmative misrepresentations and concealment, and only incidentally affect lending activity. Accordingly, the Court finds that insofar as they do not impose requirements to provide specific notices or disclosures during the foreclosure process, plaintiff's claims are not preempted by HOLA.") (citations omitted); *Romero v. Wells Fargo Bank, N.A.*, 2016 WL 6823490, at *5 (C.D. Cal. June 20, 2016) ("As alleged . . . this [misrepresentation] claim is not preempted by HOLA. The basis for the claim is that Defendant made affirmative misrepresentations that were not true when made. To allow Plaintiff's claims to proceed based on these allegations would not impose on Defendant any affirmative duties or obligations. Instead, it would be required to speak truthfully. . . . The [California Unfair Competition Law] claim is based on the allegations underlying the negligent misrepresentation claim. Therefore, it is not preempted to the extent it relies on this factual basis") (citations omitted); *Tinsley*, 4 F. Supp. 3d at 827 (upholding against a HOLA preemption challenge state unfair competition claims based on affirmatively deceptive behavior, but preempting claims based on omissions in disclosure documents); *Kajitani v. Downey Sav. & Loan Ass'n, F.A.*, 647 F. Supp. 2d 1208, 1220 (D. Haw. 2008 (similar).

This distinction makes sense — "[i]f these causes of action were preempted, federal savings associations would be free to lie to their customers with impunity." *Rumbaua v. Wells Fargo Bank, N.A.*, 2011 WL 3740828, at *7 (N.D. Cal. Aug. 25, 2011). "Lending practices cannot be more than incidentally affected by claims that 'merely seek to make defendants live up to the word of their agreements they sign with their customers.'" *Molosky*, 664 F.3d at 116 (quoting *McAnaney*, 665 F. Supp. 2d at 164).

And it is grounded in the OTS's own guidance. "The OTS itself has said that such claims only incidentally affect lending practices, 'because federal thrifts are presumed to interact with their borrowers in a truthful manner.'" *Id.* (quoting 1996 OTS Opinion at 10, 1996 WL 767462, at *5). "The opinion letter goes on to say that interpreting and applying the deceptive practices laws of multiple states presents no issue as far as preemption is concerned." *Id.*; *see also, e.g.*, *Barzelis*, 784 F.3d at 976-77 ("We agree with the consensus, concluding that similar state consumer-protection laws — those 'that establish the basic norms that undergird commercial transactions' — do not have more than an incidental effect on lending and thus escape [HOLA] preemption.") (quoting 1996 OTS Opinion) (footnote and citations omitted); *McCauley*, 710 F.3d at 558 ("Determining [for example] that the tort of fraud falls within the scope of § 560.2 [preemption] would

preclude fundamental state regulation of deceptive practices in which unscrupulous savings and loan associations might engage [in contravention of] the intent of OTS, whose 'assertion of plenary regulatory authority does not deprive persons harmed by the wrongful acts of savings and loan associations of their basic state common-law-type remedies.'") (quoting *In re Ocwen Loan Servicing, LLC Mortg. Servicing Litig.*, 491 F.3d 638, 643 (7th Cir. 2007)).[10]

In 1999, the OTS issued an opinion letter specific to force-placed insurance, concluding that HOLA preempts certain statutory unfair competition claims challenging aspects of such insurance. *See* Opinion of OTS Chief Counsel, P-99-3, *California Unfair Competition Act* (Mar. 10, 1999), 1999 WL 413698

---

[10] This reasoning is also consistent with *Silvas*, in which the Ninth Circuit held, in part, that a claim under California UCL § 17200 was preempted by HOLA. 514 F.3d at 1006. In *Silvas*, the alleged misrepresentation occurred in advertising and disclosure documents, and thus fit within § 560.2(b)(9)'s requirements regarding "disclosure and advertising." *Id.* Because the claim was preempted at the first step of the analysis, *Silvas* "[did] not reach the question of whether the law fits within the confines of paragraph (c)." *Id.*

Here, the claim is based on representations in letters sent to Wieck informing her that CIT would force place necessary windstorm coverage if she did not provide sufficient evidence of her own coverage, and that CIT or its affiliates may receive compensation in connection with placing the insurance. *Silvas* did not hold that *any* statutory unfair competition claim based on misrepresentations is necessarily preempted. *See, e.g.*, *Kajitani*, 647 F. Supp. 2d at 1220 (distinguishing *Silvas* where allegations of oral misrepresentations were not made in advertising and disclosure documents). Only if the unfair competition claim, as applied, imposes requirements regarding a category in § 560.2(b) is it necessarily preempted. *See Campdoglio*, 870 F.3d at 972 ("We found [in *Silva*] that sections 17200 and 17500 [of California's UCA], as applied to the plaintiffs' claims, imposed requirements regarding 'disclosure and advertising' as well as 'loan-related fees' on a federal savings association. Because these matters came clearly within paragraph (b) of 12 C.F.R. § 560.2, we concluded that HOLA preempted the plaintiffs' claims.).

44

("1999 OTS Opinion").  And after discussing its earlier 1996 OTS Opinion

regarding the Indiana Deceptive Acts and Practices Statute, the 1999 OTS Opinion

concluded:

> [T]o the extent that the [California Unfair Competition
> Act ("UCA")] is being used either to limit the [Savings &
> Loan Associations'] ability to force place insurance on
> properties securing loans, or the Associations' choice of
> insurers or premiums to be charged on the forced
> placement of insurance, the UCA is preempted as an
> impermissible interference with the Associations' lending
> programs.

1999 WL 413698, at *8.  The OTS, however, "emphasize[d] the extremely limited

nature of [its] preemption determination."  *Id.* at *10.  It does "not preempt the

entire UCA or its general application to federal savings associations in a manner

that only incidentally affects lending and is consistent with the objective of

allowing federal savings associations to operate in accordance with uniform

standards."  *Id.*  And it further emphasized that "[t]he plaintiffs' claims described

herein based on the forced placing of insurance or the charging of loan fees may

still be brought in state court based on traditional contract claims or other causes of

action[.]"  *Id.*[11]

---

[11]  The latter statement obviously supports the court's earlier conclusion that Wieck's
breach-of-contract claim is not preempted.

The court gives deference to the OTS's interpretation of ambiguities in its own regulations under *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (reiterating that the agency's interpretation is "controlling unless 'plainly erroneous or inconsistent with the regulation.'") (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 359 (1989)). Section 560.2 is multifaceted, and in that sense ambiguous. Neither the 1996 nor the 1999 OTS Opinion is "plainly erroneous or inconsistent" with § 560.2. Rather, they reflect careful application to specific facts of a complex three-part test outlined by the OTS and adopted by the courts. Further, there is "no reason to suspect that the interpretation[s] [do] not reflect the agency's fair and considered judgment," *Auer*, 519 U.S. at 462, which might provide reason not to give such deference. And giving *Auer* deference, Wieck's chapter 480 claims are preempted "to the extent that [chapter 480] is being used either to limit [CIT's] ability to force place insurance on properties securing loans, or [CIT's] choice of insurers or premiums to be charged on the forced placement of insurance." 1999 OTS Opinion, 1999 WL 413698, at *8.

But even with the 1999 OTS Opinion's guidance, chapter 480 claims otherwise based on affirmative misrepresentations (even as to LPI) are not preempted. Such claims — such as the allegation that Financial Freedom misrepresented that it was charging Wieck necessary costs, when it was allegedly

purchasing a "significantly more expensive policy in order to receive kickbacks, reinsurance profits and other wrongful benefits from Lloyd's, Great Lakes and Seattle Specialty," FAC ¶ 149 — would not limit a lender's right to force place insurance (something that Wieck does not contest). Nor would they necessarily limit a lender's choice of insurers or premiums. They would not "set substantive standards" for lending operations and practices. 1999 OTS Opinion, 1999 WL 413698, at *7. They would, instead, be limitations grounded in promises made in the mortgage itself. *See, e.g.*, *Sturgis*, 863 F. Supp. 2d at 98 ("[A] violation of [the Massachusetts Consumer Protection Act] that is clearly part and parcel of the contract allegation is unlikely to affect lending more than incidentally."); *Tinsley*, 4 F. Supp. 3d at 827 (allowing certain claims under the West Virginia Consumer Credit and Protection Act because "state laws regulating deceptive behavior are not preempted under HOLA").

This is not too fine a line. OTS emphasized the "extremely limited nature of [its] preemption determination," 1999 WL 413698, at *10, and reaffirmed its reasoning that a state unfair competition statute's "general application" is not preempted." *Id.* Allowing for claims based on affirmative misrepresentations is completely consistent with reasoning in the OTS's earlier 1996 Opinion that a state's "general prohibition on deception should have no

measurable impact on [lender's] lending operations," because "federal thrifts are presumed to interact with their borrowers in a truthful manner." 1996 WL 767462, at *6. *See Binetti v. Wash. Mut. Bank*, 446 F. Supp. 2d 217, 219 (S.D.N.Y. 2006) ("[T]he two [OTS] opinions are not in conflict. Indeed, they both support plaintiff's position that the New York Consumer Fraud Statute is not preempted."); *id.* at 220 ("OTS bent over backwards to distinguish the [1999] opinion from its 1996 opinion, and to limit the scope of the opinion to the very 'narrow circumstances' presented."). Lenders are certainly allowed to force place hazard insurance, but they cannot do so with impunity and make misrepresentations when doing so.

Accordingly, the court GRANTS in part and DENIES in part CIT's Motion as to preemption of Wieck's chapter 480 claims. Such claims are preempted to the extent they are premised on a failure to disclose information, or are "being used either to limit [CIT's] ability to force place insurance on properties securing loans, or [CIT's] choice of insurers or premiums to be charged on the forced placement of insurance." 1999 WL 413698, at *8. But to the extent they are based on CIT's affirmative misrepresentations, they survive CIT's HOLA preemption challenge. The court, however, will not parse the FAC's lengthy allegations to excise the preempted aspects of the claims. Going forward,

however, only those aspects of the FAC's chapter 480 claims that are grounded in affirmative misrepresentation are actionable against CIT.

5. **HOLA Preemption Applies Only to Actions Before February 28, 2014**

Next, because the court has found at least some claims to be preempted, it must determine whether preemption applies to any actions taking place after February 28, 2014 (the date CIT's affiliate, OneWest Bank changed its charter from a federal savings bank to a national association) — in other words, whether HOLA preemption attaches to the loan. And after carefully considering the split in views among district courts — *see, e.g.*, *Kenery*, 2014 WL 129262, at *4 ("[T]he district courts have taken three distinct positions on this issue.") — the court agrees with those courts that "have applied HOLA preemption only to conduct occurring before the loan changed hands from the federal savings association or bank to the entity not governed by HOLA." *Rijhwani*, 2014 WL 890016, at *7 (citing cases).

That is, a national association, like CIT, is not "automatically and permanently imbued with a preemption defense so long as the loan originated with a federal savings bank." *Penermon v. Wells Fargo Bank, N.A.*, 47 F. Supp. 3d 982, 994 (N.D. Cal. 2014). If this were so, a national bank "would have license to violate the terms of the [mortgage contract], of which it was a signatory, with

49

impunity . . . so long as their loans originated with a federal savings bank." *Id.* at

994-95.  Such a result would "run[] afoul of one of the original purposes of HOLA

enactment:  consumer protection." *Id.* at 995.  "HOLA was not enacted to provide

a defense to actions that would otherwise violate consumer protection laws." *Id.*[12]

    And so this court joins "[a] growing number of courts [that] have

found that HOLA preemption applies after an FSA's [(federal savings

association's)] merger with a national bank only to claims arising from the conduct

of the FSA." *Davis v. Wells Fargo, N.A.*, 2016 WL 7116681, at *6 (E.D. Cal. Dec.

---

[12]  In support of the contrary conclusion, CIT cites *Metzger v. Wells Fargo Bank, N.A.*,
2014 WL 1689278 (C.D. Cal. Apr. 28, 2014), which allowed a national association to apply
HOLA preemption to a loan originated by a federal savings bank. *Id.* at *4.  *Metzger* relied in
part on a 2003 OTS Opinion that indicated that assignees of loans originated by federal savings
banks may apply HOLA preemption defenses. *Id.* (citing OTS Opinion Letter, P-2003-5 (July
23, 2003) [available at 2003 WL 24040104]).  In a footnote in that OTS Opinion, the OTS cited
a "general principle that loan terms should not change simply because an originator entitled to
federal preemption may sell or assign a loan to an investor that is not entitled to federal
preemption."  2003 WL 24020104, at *4 n.18.  The OTS, however, was not interpreting a
specific rule such that deference might be owed under *Auer*.  The court also gives limited weight
to this OTS opinion because, as *Penermon* reasoned:

> The legal opinion letter was issued at the request of a federal savings association
> to address to how the state law applied to federal savings associations.  It does not
> address whether HOLA preemption applies to the actions of national banks that
> acquire federal savings loans.

47 F. Supp. 3d at 993.  *Penermon* concluded that "while [a national association] may invoke
HOLA preemption if the alleged wrongdoing arises out of [a federal savings bank's] pre-merger
conduct, where [the national association's] own conduct is the subject of litigation, HOLA does
not necessarily apply." *Id.* at 994.  Likewise, this court is *allowing* CIT to invoke HOLA
preemption, but only as to conduct when it (or its affiliate) was actually a federal savings
association.

6, 2016), *Findings and Recommendation adopted*, 2017 WL 729541 (E.D. Cal. Feb. 23, 2017) (citing and noting numerous cases). In short, "[c]laims which would have been preempted pre-acquisition should remain preempted post-acquisition. This principle does not, however, support effectively immunizing successor entities for otherwise actionable post-acquisition conduct." *Id.* at *7. *See also, e.g.*, *Pimentel*, 2015 WL 2184305, at *3 ("So, while [a national association] does inherit the liabilities and possible defenses that [an FSA] could raise about its own conduct, [a national association] itself cannot violate state laws when servicing loans that were originated by an entity regulated by HOLA.") (quoting *Penermon*, 47 F. Supp. 2d at 995, and citing cases).

Just as the court does not parse the FAC's allegations between preempted and saved chapter 480 claims (i.e., claims that are actionable as to affirmative misstatements), the court will also not parse the FAC's allegations of wrongdoing between pre- and post-February 28, 2014 conduct. During oral argument, Wieck's counsel indicated that — if the court were to find any claims preempted by HOLA but limited such preemption to pre-February 28, 2014 conduct — she would request leave to file a second amended complaint to clarify whether or to what extent her claims are not preempted. The court agrees to such a request, and GRANTS leave to amend to allow Wieck to attempt to assert non-

HOLA preempted chapter 480 claims.  This leave extends both to clarifying whether claims are based on affirmative representations and whether they occurred before or after February 28, 2014.

**C.     Merits of Breach of Contract and Chapter 480 Claims Against CIT**

CIT next argues that, to the extent the breach of contract and chapter 480 claims are not preempted by HOLA, they nevertheless fail to state a claim on the merits.  The court disagrees, at least in part.

As set forth earlier when discussing preemption, Wieck's theory is that when CIT force placed hurricane coverage and charged her account excessive premiums (including amounts paid by or to the insurance company or agent), it breached the mortgage contract because the contract only allows the lender to do what is "necessary" to protect the value of the mortgaged property.  It was not "necessary" for CIT to charge her for amounts that exceeded the cost of hurricane insurance and for unrelated expenses.  It was not necessary to include other amounts (alleged "kickbacks" or unearned "commissions") in the amount charged as an insurance premium.  And it was not necessary for the force-placed insurance to be "backdated" or made "retroactive" to cover past periods when no hurricanes had occurred.

At this motion-to-dismiss stage, Wieck's breach-of-contract theory and chapter 480 claims based on affirmative misrepresentations are plausible.[13]  In this regard, the court is convinced by the reasoning of cases such as *Perryman v. Litton Loan Servicing, LP*, 2014 WL 4954674 (N.D. Cal. Oct. 1, 2014), and *Longest v. Green Tree Servicing LLC*, 74 F. Supp. 3d 1289 (C.D. Cal. 2015). These cases reject the same arguments now proffered by CIT — that the mortgage unambiguously provides that the lender may do whatever is necessary to protect the value of the mortgaged property, and that nothing in the mortgage specifically prohibits commissions or fees as part of the cost of LPI — reasoning that "if this were the rule, it would grant unfettered license to mortgage servicers to mark-up the charges for force-placed insurance with no limit whatsoever." *Longest*, 74 F. Supp. 3d at 1297 (quoting *Perryman*, 2014 WL 4954674, at *12).  "If the [mortgage] were interpreted to provide lenders with limitless discretion to set *any*

---

[13]  "Hawaii enacted section 480-2 'in broad language in order to constitute a flexible tool to stop and prevent fraudulent, unfair or deceptive business practices for the protection of both consumers and honest businessmen.'"  *Compton*, 761 F.3d at 1052 (quoting *Ai v. Frank Huff Agency, Ltd.*, 61 Haw. 607, 616, 607 P.2d 1304, 1311 (1980), *overruled on other grounds by Robert's Haw. Sch. Bus, Inc. v. Laupahoehoe Transp. Co.*, 91 Haw. 224, 982 P.2d 853 (1999)). "Hawaii courts have held that '[a] practice is unfair when it offends established public policy and when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.'"  *Id.* (quoting *Balthazar v. Verizon Haw., Inc.,* 109 Hawaii 69, 77, 123 P.3d 194, 202 (2005)).  "[A] deceptive act or practice is '(1) a representation, omission, or practice that (2) is likely to mislead consumers acting reasonably under the circumstances where (3) the representation, omission, or practice is material.'"  *Courbat v. Dahana Ranch, Inc.*, 111 Haw. 254, 262, 141 P.3d 427, 435 (2006) (quoting *FTC v. Verity Int'l, Ltd.*, 443 F.3d 48, 63 (2d Cir. 2006) (square brackets omitted)).

amount as the 'cost' of insurance, through any means, the contract would be unconscionable. Therefore, [lender's] discretion to assess costs must be limited in some way to the reasonable understanding contracting parties would ascribe to the words of the [mortgage.]" *Perryman*, 2014 WL 4954674, at *12.[14] *See also, e.g.*, *McNeary-Calloway v. JP Morgan Chase Bank, N.A.*, 863 F. Supp. 2d 928, 956 (N.D. Cal. 2012) (permitting a breach-of-contract cause of action alleging that "excessive" premiums are not "necessary" to protect a property's value, where the mortgage allowed a lender to procure "necessary" insurance), *superseded by*

---

[14] Like other contracts, the mortgage contract contains an implied covenant of good faith and fair dealing. *See, e.g.*, *Best Place, Inc. v. Penn Am. Ins. Co.*, 82 Haw. 120, 123-24, 920 P.2d 334, 337-38 (1996). This duty of good faith does not create an independent cause of action in tort in a non-insurance context. *See, e.g.*, *Jou v. Nat'l Interstate Ins. Co. of Haw.*, 114 Haw. 122, 129, 157 P.3d 561, 568 (Haw. Ct. App. 2007). Nevertheless, the covenant does have relevance for Wieck's breach of contract claim, essentially placing some limits on the amounts the lender/servicer can charge as "necessary" to protect an interest in property. *See, e.g.*, *Gramercy Grp., Inc. v. D.A. Builders, LLC*, 2018 WL 1245480, at *6 (D. Haw. Mar. 9, 2018) (finding questions of fact as to breach of contract, given conflicting evidence as to whether a party acted in good faith) (citing *Triangle Mining Co. v. Stauffer Chem. Co.*, 753 F.2d 734, 738 (9th Cir. 1985) ("Good faith . . . requires that a party vested with contractual discretion must exercise his discretion reasonably and may not do so arbitrarily or capriciously." (citation and internal quotation marks omitted)); *cf. Atooi Aloha, LLC v. Gaurino*, 2018 WL 650194, at *4 (D. Haw. Jan. 31, 2018) ("[T]he fact that the Escrow Instructions did not specifically preclude defendant from secretly profiting on third-party charges does not mean it was free to do so.") (quoting *Tavenner v. Talon Grp.*, 2012 WL 6022836, at *4 (W.D. Wash. Dec. 4, 2012)).

For these reasons, Count Two (seeking damages for "breach of implied covenant of good faith and fair dealing) is DISMISSED with prejudice, although its allegations are relevant for the breach-of-contract claim. *See, e.g.*, *Stoebner Motors, Inc. v. Automobili Lamborghini S.P.A.*, 459 F. Supp. 2d 1028, 1037 (D. Haw. 2006); *Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1443 (7th Cir. 1992) ("[T]he covenant guides the construction of explicit terms in an agreement."). Because Count Two is dismissed, Wieck is granted leave to amend Count One — her breach-of-contract claim — to incorporate the concept of a violation of the implied covenant as part of the basis of that Count.

*statute on other grounds as recognized in Cannon v. Wells Fargo Bank, N.A.*, 2013 WL 3388222 (N.D. Cal. July 5, 2013); *Faili v. BAC Home Loans Servicing LP*, 2014 WL 255704, at *8 (C.D. Cal. Jan. 23, 2014) ("While the Limiting Provision afforded the Bank of America Defendants discretion to force-place insurance on Plaintiffs' respective properties under the Insurance Provision, it did not necessarily permit the Bank of America Defendants to do so in the manner alleged by Plaintiff."); *but see, e.g.*, *Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601, 612 (7th Cir. 2013) ("Nothing in the loan agreement and related documents prohibits Wachovia and its insurance-agency affiliate from receiving a fee or commission when lender-placed insurance becomes necessary.").

Similarly, the court is not convinced by CIT's argument that the claims fail because the mortgage expressly permits the allegedly wrongful conduct. The mortgage permits CIT to do what is "necessary" to protect its interest in the property (i.e., force place hurricane insurance) but not to misrepresent material facts when doing so. Wieck concedes that the mortgage authorized CIT to obtain insurance if necessary, and the court agrees (as cited by Defendants) with its decision in *Gray v. OneWest Bank*, 2014 WL 3899548 (D. Haw. Aug. 11, 2014), that "Plaintiff cannot base a [chapter 480] claim on Defendant's purchase of hurricane insurance standing alone[.]" *Id.* at *11. But Wieck's chapter 480 claims

against CIT are "not based simply on Defendant's purchase of hurricane insurance [but] [r]ather . . . on the same basic allegations of the breach of contract claim[.]" *Id.* Indeed, *Gray* denied summary judgment on a chapter 480 claim where questions of fact remained regarding alleged errors in servicer's procurement of hurricane insurance, including "whether all fees and charges related to the hurricane insurance (if any) were reversed." *Id.*

Likewise, the court is not convinced by the argument that Wieck may not assert a breach-of-contract claim because *she* failed to perform first (by failing to maintain hurricane coverage under the mortgage). *See Longest*, 74 F. Supp. 3d at 1298 (rejecting the contention that "plaintiffs' failure to maintain hazard insurance constitutes a material breach of the mortgage," excusing the defendant's alleged breach); *Persaud v. Bank of Am., N.A.*, 2014 WL 4260853, at *8 (S.D. Fla. Aug. 28, 2014) ("Contrary to Defendants' argument, the fact [that] Plaintiff initially breached the Mortgage when his insurance policy lapsed does not preclude his breach of contract claim."); *Hamilton v. Suntrust Mortg., Inc.*, 6 F. Supp. 3d 1300, 1309 (S.D. Fla. 2014) ("[O]nce [lender] chose to continue the mortgage contracts by exercising its discretion to force-place insurance after Plaintiffs' admitted breaches, [lender] was obliged to do so in good faith. For this reason, Plaintiffs' prior breaches of their mortgage contracts — regardless of whether they

were material breaches — do not preclude their claim for breach of the implied covenant of good faith and fair dealing against [lender]"); *Faili*, 2014 WL 255704, at * 7 ("Defendants cannot excuse their own alleged breach based on the breach allegedly committed by Plaintiffs.").

The court also rejects CIT's argument that the breach-of-contract and chapter 480 claims fail for lack of damages. As set forth earlier when concluding that Wieck has standing, the FAC alleges harm — even if allegedly excessive premiums and unnecessary charges were credited back to Wieck — such as foreclosure-related damages, costs incurred defending that suit, and costs incurred in challenging CIT's allegedly wrongful actions (e.g., expert consultant expenses). It may well be that Wieck will only be able to prove a relatively small amount of damages, but at this stage, a minimal amount of damages is not a basis to dismiss the breach-of-contract or chapter 480 claims. *See Compton*, 761 F.3d at 1054 ("A plaintiff's 'allegation that he has, as a "direct and proximate result" of [defendant's] violation [of section 480-2], "sustained special and general damages" suffices to withstand a motion to dismiss under Rule 12(b)(6).'") (quoting *Jenkins v. Commonwealth Land Title Ins. Co.*, 95 F.3d 791, 799 (9th Cir. 1996)).

Although CIT's (and the other Defendants') arguments justifying "backdating" of LPI have considerable force, the court will also allow claims based

on that theory to proceed past this motion-to-dismiss stage.  Defendants argue that

procuring LPI "retroactive" to the date of the lapse is required and complies with

Wieck's mortgage (and is thus not unfair or deceptive under chapter 480) because

the mortgage and Fannie Mae guidelines require *continuous* coverage.  *See, e.g.*,

*Cohen*, 735 F.3d at 613.  And "continuous" coverage necessarily means there are

no lapses.  It may take time for a lender or servicer to discover a lapse in coverage

and give a borrower the necessary notice to cure the lapse before imposing LPI.

"Backdated" coverage fills the gap in the event that property incurs insurable

losses during lapses in coverage.  Cases explain, for example, that a lender may

have no way of knowing whether losses might have arisen during the lapsed

period, such as latent damages like mold or structural issues with flood insurance.

*See, e.g.*, *Cannon*, 2013 WL 3388222, at \*5 ("Plaintiffs failed to explain . . . why it

would be unreasonable to backdate flood insurance given that, *e.g.*, some damage

may not be readily apparent (such as mold).");  *Cohen*, 735 F.3d at 613 ("How

could [lenders] know — either in [borrower's] case or in the case of *any* particular

borrower — whether or not a property loss had occurred during the lapse

period?").[15]  The nature of LPI apparently is such that, once placed and

---

[15]  For flood insurance, Congress amended the National Flood Insurance Act in 2012 to expressly allow LPI to be placed beginning on the date coverage had lapsed.  *See* 42 U.S.C.

(continued . . .)

"backdated," it necessarily covers any losses (known or not) that may have *already* occurred during a lapsed period. And the alternative — disallowing retroactive LPI and requiring it to be charged and placed only from the date the lender or servicer *notifies* a borrower — could improperly create an incentive for borrowers not to insure property against hazards.

This argument that the mortgage contractually requires "continuous" coverage, however, is grounded in the mortgage documents themselves. In *Cohen*, for example, the borrower signed a "Notice of Fire/Hazard Insurance Requirements" that explicitly stated "The terms of our loan documents require maintenance of continuous insurance coverage." 735 F.3d at 605. But here, Wieck's mortgage does not itself explicitly require "continuous" coverage — it requires insurance to be "maintained in the amounts, to the extent and for periods required by Lender," ECF No. 15-1, Mortg. ¶ 3, with the qualification that "Lender may do and pay whatever is necessary to protect the value of the Property[.]" *Id.* ¶ 5. Wieck, like the borrower in *Cohen*, might have signed a similar "Notice of

---

(. . . continued)
§ 4012a(e)(2) ("If the borrower fails to purchase such flood insurance within 45 days after notification . . . the lender or servicer for the loan shall purchase the insurance on behalf of the borrower and may charge the borrower for the cost of premiums and fees incurred by the lender or servicer for the loan in purchasing the insurance, including premiums or fees incurred for coverage *beginning on the date on which flood insurance coverage lapsed* or did not provide a sufficient coverage amount.") (emphasis added).

Fire/Hazard Insurance Requirements" document that made clear she was required to have "continuous coverage." But if so, such a document is not before the court now. And the Fannie Mae guideline cited by CIT likewise does not explicitly require continuous coverage. *See* ECF No. 55-3 (providing in part only that "[p]roperty insurance for home mortgages must protect against loss or damage from fire and other hazards covered by the standard extended coverage endorsement . . . . We will not accept hazard insurance policies that limit or exclude from coverage (in whole or in part) windstorm, hurricane, hail damages, or any other perils that are normally included under an extended coverage endorsement[.]"). It may be implicit in the Fannie Mae guidelines that the coverage must be continuous (or another guideline may explicitly say so), but the record is not clear enough for the court to make that determination as a matter of law now.

Moreover, Wieck has argued that the nature of *hurricane* insurance (in contrast to other hazards such as floods or earthquakes, for example) might render it not "necessary" to impose coverage from the date of lapse — it is undisputed that no hurricanes struck Hawaii during the lapsed time periods

(something that would be confirmable when coverage was placed).[16]  The court,

however, needs more information regarding the nature and limitations of LPI

before it can fully assess whether hurricane insurance might be distinguishable

from other types of hazard insurance.

Defendants argue that "[t]he Consumer Financial Protection Bureau,

which regulates mortgage servicing, has made clear that 'backdating' LPI is legal

and proper."  Seattle Specialty Mem. at 25 n.7, ECF No. 56-1 (citing *Mortg. Serv.*

*Rules Under the Real Estate Settlement Procedures Act (Reg. X)*, 78 Fed. Reg.

10,696, 10,892, 2013 WL 525347 (Feb. 14, 2013)).  Although relevant, the

Bureau's comment is qualified; it reads "*if not prohibited by State or other*

*applicable law*, a servicer may charge a borrower for force-placed insurance the

servicer purchases, retroactive to the first day of any period of time in which the

borrower did not have hazard insurance.") (emphasis added).  Moreover, the

Bureau was implementing parts of Dodd-Frank, and commenting on regulations

that did not take effect until January 2014.  *See Lane v. Wells Fargo Bank, N.A.*,

2013 WL 1758878, at *3 (N.D. Cal. Apr. 24, 2013) ("This comment . . . will not be

in effect until January 2014 [and] Defendant's assertion that this comment clarified

---

[16]  To the extent necessary, the court GRANTS Wieck's Request for Judicial Notice, ECF No. 67, regarding records of the Central Pacific Hurricane Center.

existing law [regarding backdating of LPI] is also unpersuasive.") (citing 78 Fed. Reg. at 10696). Accordingly, the court does not rely on this comment.[17]

In this context, the language of the mortgage agreement is ambiguous. Similar to language determined to be ambiguous in *Longest* and other cases (where a mortgage authorized a lender or servicer to do "whatever is reasonable or appropriate to protect Lender's interest in the Property"), the "whatever is necessary" language in Wieck's mortgage "create[s] ambiguities regarding the authorized level of insurance and the propriety of commissions that cannot be resolved at this [motion-to-dismiss] stage." 74 F. Supp. 3d at 1298 (quoting *Maloney v. Indymac Mortg. Servs.*, 2014 WL 6453777, at *6 (C.D. Cal. Nov. 17, 2014)). *See also, e.g.*, *Castle v. Capital One, N.A.*, 2014 WL 176790, at *4 (D. Md. Jan. 15, 2014) ("[W]hether Defendant was permitted to purchase backdated hazard insurance, and in what amount, is left ambiguous by the language of the

---

[17] The Dodd-Frank regulation at issue, 12 C.F.R. § 1024.37, does indeed concern force-placed insurance. To the extent it is relevant, however, it also could support Wieck — it provides limitations on force-placed insurance charges, stating in part that "all charges related to force-placed insurance assessed to a borrower . . . must be bona fide and reasonable," where "[a] bona fide and reasonable charge is a charge for service actually performed that bears a reasonable relationship to the servicer's cost of providing the service, and is not otherwise prohibited by applicable law." 12 C.F.R. §§ 1024.37(h)(1) & (2). And Fannie Mae is apparently now "requiring that the lender-placed insurance premiums charged to the borrower or reimbursed by Fannie Mae must *exclude* any lender-placed insurance commission or payments earned or received by the servicer, or other entities or individuals affiliated with the servicer (employees, agents, brokers, etc.)." FannieMae, Servicing Guide Announcement SVC-2013-27: Lender-Placed Insurance Requirements (Dec. 18, 2013), available at https://www.fanniemae.com/content/announcement/svc1327.pdf (emphasis added) (last accessed March 27, 2018).

Deed of Trust. . . . [thus] to the extent that such determination is relevant to resolution of the ultimate issues . . . it is not appropriate to determine the proper construction of the Deed of Trust on a motion to dismiss"). That is, at least as to backdating, "Defendant[s] may still be able to show that [their] actions complied with [Wieck's] contractual requirements, but this analysis is inappropriate to undertake on a motion to dismiss." *Lane*, 2013 WL 1758878, at *3.

## D. Count Four — Chapter 480 Claims as to Seattle Specialty and Lloyd's/Great Lakes

For largely the same reasons that Wieck's chapter 480 claims survive CIT's Motion to Dismiss, they also survive Seattle Specialty and the Insurer Defendant's Motions. In this regard, the court recognizes that claims preempted by HOLA as to CIT are not preempted as to the other Defendants. For that reason, claims of deceptive or unfair practices based on *non-disclosure* of material information (as opposed to affirmative misrepresentation) may also be considered as to those Defendants.

Specifically, assuming as required at this stage that the FAC's well-pleaded factual allegations are true, Count Four alleges a plausible theory that Seattle Specialty, Lloyds, and Great Lakes committed unfair or deceptive acts that damaged Wieck. It alleges that the LPI insurance "costs" were high not because that "actual cost" was high, but "because Financial Freedom had selected the

significantly more expensive Lloyd's and Great Lakes polices in order to receive kickbacks, reinsurance profits and other wrongful benefits from Lloyd's and Great Lakes via Seattle Specialty." FAC ¶ 163. That is, essentially, the higher the premium, the higher the "compensation" for placing the insurance. "The insurance premiums were also inflated to pay for the kickbacks and other unlawful benefits that Lloyd's, Great Lakes and Seattle Specialty provided to Financial Freedom." *Id.*

The FAC also alleges that these Insurer Defendants "had a relationship with Financial Freedom," *id.* ¶ 161, whereby Wieck was not being charged the necessary "cost" of LPI (despite being told so) but instead was being charged the cost, plus other unnecessary amounts such as a "commission" (or "kickback" or remuneration). *Id.* ¶ 164. Even if it was explained to Wieck that CIT or its affiliates might receive "compensation in connection with the placement" of the LPI, ECF No. 55-4, it could be misleading and unfair for purposes of chapter 480 to then *charge* Wieck for that "compensation" by including it in the amounts represented to be a premium. That is, it is unclear at this stage whether this is allowed or "necessary" under the terms of the mortgage.

As discussed previously, Defendants' arguments justifying or explaining the necessity of "backdating" LPI to prevent gaps in continuous

coverage have considerable force — that is, such "backdating" may well be justified. The court, however, needs further information before it can fully address whether hurricane coverage must be "continuous," and whether "continuous" coverage was actually (explicitly or implicitly) part of the mortgage documents.

Finally, in opposing Defendants' Motions, Wieck argues that it is an unfair or deceptive insurance practice to pay "rebates" or commissions, citing HRS § 431:13-108(8). Such a violation, Wieck apparently argues, would support her chapter 480 claim. The court, however, will not address this argument because the FAC does not actually allege a violation of Hawaii's insurance code (and does not mention a violation of § 431:13-103(8)) as a basis for a chapter 480 claim. If Wieck intends to raise this theory, she must first allege facts supporting it in an amended complaint. And because the court has granted Wieck leave to amend her chapter 480 claims as to CIT, it will also allow Wieck to amend her chapter 480 claims as to the other Defendants to raise a theory based on § 431:13-103(8), if possible.

In short, although Defendants' Motions as to Count Four are DENIED, Wieck is nevertheless granted leave to amend Count Four to explain the basis of her claims in more detail.

**E.     RICO Claims**

Next, Defendants challenge Counts Six and Seven, which allege

violations of the Racketeering Influenced and Corrupt Organizations Act

("RICO"), 18 U.S.C. §§ 1961 et seq.  The court agrees that these counts fail to

state plausible claims for relief.

**1.     *RICO Standards***

RICO provides a civil remedy, which specifies in part that "[a]ny

person injured in his business or property by reason of a violation of [18 U.S.C.

§ 1962] may sue therefor in any appropriate United States district court and shall

recover threefold the damages he sustains and the cost of the suit."  18 U.S.C.

§ 1964(c).  "To prevail on a civil RICO claim, a plaintiff must prove that the

defendant engaged in (1) conduct (2) of an enterprise (3) through a pattern (4) of

racketeering activity and, additionally, must establish that (5) the defendant caused

injury to plaintiff's business or property."  *Chaset v. Fleer/Skybox Int'l., LP*, 300

F.3d 1083, 1086 (9th Cir. 2002) (citing 18 U.S.C. §§ 1962(c), 1964(c)); *see also*

*Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353, 361 (9th Cir.

2005) (reiterating elements of a civil RICO claim).[18]  "A plaintiff must show that

---

[18] Section 1962(c) makes it unlawful "for any person employed by or associated with any
enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to

(continued . . .)

the defendant's RICO violation was not only a 'but for' cause of his injury, but that it was a proximate cause as well." *Oki Semiconductor Co. v. Wells Fargo Bank, Nat. Ass'n*, 298 F.3d 768, 773 (9th Cir. 2002) (citing *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 268-69 (1992)). "Some 'direct relationship' between the injury asserted and the injurious conduct is necessary." *Id.* (quoting *Holmes*, 503 U.S. at 269).

"'[T]o conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs,' § 1962(c), one must participate in the operation or management of the enterprise itself." *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993). "[O]ne must have some part in directing those affairs." *Id.* at 179. An "enterprise," for purposes of RICO includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). A "pattern . . . requires at least two acts of racketeering activity." 18 U.S.C. § 1961(5). "Racketeering activity is any act indictable under various provisions of 18 U.S.C. § 1961 and includes the predicate acts alleged in this case of mail fraud and wire fraud under 18 U.S.C. §§ 1341 and 1343." *Forsyth v. Humana, Inc.*, 114

---

(. . . continued)
conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity[.]"

F.3d 1467, 1481 (9th Cir. 1997), *overruled on other grounds by Lacey v. Maricopa Cty.*, 93 F.3d 896 (9th Cir. 2012) (en banc).

In turn, "[w]ire or mail fraud consists of the following elements: (1) formation of a scheme or artifice to defraud; (2) use of the United States mails or wires, or causing such a use, in furtherance of the scheme; and (3) specific intent to deceive or defraud." *Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 557 (9th Cir. 2010) (citation omitted). Under Federal Rule of Civil Procedure 9(b), although "the elements of knowledge and intent may be averred generally; the factual circumstances of the fraud itself require particularized allegations." *Queen's Med. Ctr. v. Kaiser Found. Health Plan, Inc.*, 948 F. Supp. 2d 1131, 1158 (D. Haw. 2013) (citing *Sanford*, 625 F.3d at 558).

"Rule 9(b) does not allow a complaint to merely lump multiple defendants together but requires plaintiffs to differentiate their allegations when suing more than one defendant and inform each defendant separately of the allegations surrounding his alleged participation in the fraud." *United States v. Corinthian Colls.*, 655 F.3d 984, 997-98 (9th Cir. 2011) (quoting *Swartz v. KPMG LLP,* 476 F.3d 756, 764-65 (9th Cir. 2007)). "In the context of a fraud suit involving multiple defendants, a plaintiff must, at a minimum identify the role of

each defendant in the alleged fraudulent scheme." *Id.* (quoting *Swartz*, 476 F.3d at 765).

### 2. *Application of Standards*

Wieck's RICO claims under § 1962(c) fail for several reasons. Initially, she "has not adequately alleged that [each] defendant 'directed' the affairs of the alleged enterprise." *Valdez v. Saxon Mortg. Servs., Inc.*, 2014 WL 7968109, at *14 (C.D. Cal. Sept. 29, 2014) (dismissing force-placed insurance RICO claim with leave to amend) (citing *Reeves*, 507 U.S. at 179). That is, the FAC does not explain how each Defendant "participate[d] in the operation or management of the enterprise itself." *Reeves*, 507 U.S. at 185. Instead, the FAC improperly lumps Defendants together, without explaining each Defendant's particular role in the enterprise. *See, e.g.*, *Corinthian Colls.*, 655 F.3d at 997-98.

For example, the FAC alleges that "Financial Freedom, CIT Bank, N.A., Lloyd's, Great Lakes and Seattle Specialty conducted and participated in the affairs of this RICO enterprise," FAC ¶ 184, without explaining the particular role of each Defendant. Rather it (1) refers generally to "Defendants," *id.* ¶¶ 185, 186, 188a, 188c., 189-196; or (2) refers to them collectively. *See id.* ¶ 185 ("Lloyd's and Great Lakes and Seattle Specialty, with the approval of Financial Freedom, sent standardized form letters to Plaintiff[.]") & ¶ 197 ("Financial Freedom, CIT

Bank, N.A., Lloyd's, Great Lakes and Seattle Specialty directed and controlled the enterprise by:"). A RICO complaint must "detail with particularity the time, place, and manner of each act of fraud, plus the role of each defendant in each scheme." *Lancaster Cmty. Hosp. v. Antelope Valley Hosp. Dist.*, 940 F.2d 397, 405 (9th Cir. 1991).

Second, even if the court has determined that the FAC's misrepresentation allegations are adequate under HRS chapter 480, the allegations are insufficient to meet Rule 9(b)'s particularity standard for purposes of mail or wire fraud.[19] *See, e.g.*, *Bald v. Wells Fargo Bank, N.A.*, 688 F. App'x 472, 476-77 (9th Cir. 2017) ("No heightened pleading standard applies . . . under the 'unfair' prong [of HRS § 480-2.]"). That is, the FAC's allegations of a pattern of racketeering activity are deficient. In particular, the factual allegations are insufficient to demonstrate a "specific intent to defraud" as is necessary for mail fraud. *See, e.g.*, *Eclectic Props. E. LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 997 (9th Cir. 2014).

"The intent to defraud may be inferred from a defendant's statements and conduct." *Id.* (quoting *United States v. Peters*, 962 F. 2d 1410, 1414 (9th Cir.

---

[19] Indeed, although Wieck mentions "interstate mails and wire communications," FAC ¶ 180, the FAC does not appear to allege any facts regarding wire fraud — it appears restricted to mail fraud as it focuses on a series of letters sent from "Defendants" from 2010 until 2016. FAC ¶¶ 185-195.

1992)).  But the "'level of factual specificity needed to satisfy this pleading requirement will vary depending on the context.'"  *Id.* (quoting *In re Century Aluminum Co. Secs. Litig.*, 729 F.3d 1104, 1107 (9th Cir. 2013)).  And "RICO claims premised on mail or wire fraud must be particularly scrutinized because of the relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it."  *Scher v. Premier Holdings, Inc.*, 2010 WL 1064678, at *4 (D. Haw. Mar. 24, 2010) (quoting *W. Assoc. Ltd. P'ship, ex rel. Ave. Assoc. Ltd. P'ship v. Mkt. Square Assoc.,* 235 F.3d 629, 637 (D.C. Cir. 2001)).  This is partly because "RICO was intended to combat organized crime, not to provide a federal cause of action and treble damages to every tort plaintiff." *Oscar v. Univ. Students Coop. Ass'n,* 965 F.2d 783, 786 (9th Cir. 1992). *abrogated on other grounds by Diaz v. Gates,* 420 F.3d 897 (9th Cir. 2005)).

Here, Wieck bases her RICO claim on a series of letters from Financial Freedom (allegedly sent by or with assistance of the other Defendants). She acknowledges that the letters repeatedly notified her that (1) "windstorm" (sometimes referred to as "windstorm (including hail/hurricane)") was lacking and that such coverage would be placed, for the benefit of the lender, on the property, (2) she would be charged for the "cost" of the insurance, (3) Financial Freedom or its affiliates "may receive compensation in connection with the placement" of such

insurance, and (4) the "cost" of such insurance "may be significantly higher than the cost of such insurance purchased through your own agent or company." ECF No. 55-12 (emphasis omitted). Even if these letters contained misrepresentations or omitted material information (for example, that the "cost" of the insurance actually included commissions or "kickbacks" for placement), the notification letters themselves are inconsistent with a broader "specific intent to *defraud*." They might be unfair or deceptive, but (without more) fall short of a plausible continuing scheme of *actual fraud*. This claim fails to meet Rule 9(b)'s particularity standard.

Third, at least as to the insurer Defendants (Lloyd's and Great Lakes) and Seattle Specialty, the RICO claim fails for lack of proximate causation as to any foreclosure-related damages. *See, e.g.*, *Oki Semiconductor*, 298 F.3d at 773 ("Some 'direct relationship' between the injury asserted and the injurious conduct is necessary.") (quoting *Holmes*, 503 U.S. at 269). Plaintiff's theory is that the high premiums assessed by Financial Freedom (with the involvement of other Defendants) led to Financial Freedom foreclosing on the property, which then led to an un-refunded $30 inspection fee and to consequential damages related to defending against the foreclosure. As to the insurer Defendants and Seattle Specialty, such damages — without more — are too attenuated to satisfy RICO's

proximate cause requirement. These Defendants were not involved in the foreclosure, and the alleged scheme does not involve foreclosing on borrowers who do not pay any inflated premiums (these Defendants would not benefit from foreclosing on the mortgage).

Because Wieck fails to state a claim under § 1962(c), her claim under § 1962(d) for a *conspiracy* to violate § 1962(c) necessarily fails. *See, e.g.*, *Howard v. Am. Online Inc.*, 208 F.3d 741, 751 (9th Cir. 2000) ("[T]he failure to adequately plead a substantive violation of RICO precludes a claim for conspiracy."). [20]

In sum, Wieck fails to state plausible RICO claims. Nevertheless, the court will grant Wieck leave to file a Second Amended Complaint to attempt to rectify these pleading deficiencies. In deciding whether to do so, Wieck should seriously consider whether this is the type of case RICO was intended to address.

## F.     Tortious Interference with Contract alleged against Seattle Specialty, Lloyd's and Great Lakes

Seattle Specialty and the insurer Defendants also move to dismiss Count Five ("Tortious Interference with a Business Relationship"), which the court

---

[20] Because the court dismisses the RICO claims on the merits, it does not reach whether the claims are barred by the four-year limitations period. *See Grimmett v. Brown*, 75 F.3d 506, 511 (9th Cir. 1996) (applying the "injury discovery" rule to a RICO claim, rather than a "last predicate act" or "injury and pattern discovery" rule).

construes as a claim for tortious interference with contractual relations under

Hawaii law.

> The requisite elements of tortious interference with
> contractual relations are: 1) a contract between the
> plaintiff and a third party; 2) the defendant's knowledge
> of the contract; 3) the defendant's intentional inducement
> of the third party to breach the contract; 4) the absence of
> justification on the defendant's part; 5) the subsequent
> breach of the contract by the third party; and 6) damages
> to the plaintiff.

*Meridian Mortg., Inc. v. First Hawaiian Bank*, 109 Haw. 35, 44, 122 P.3d 1133,

1142 (Haw. Ct. App. 2005) (quoting *Weinberg v. Mauch*, 78 Haw. 40, 50 890 P.2d

277, 287 (1995) (brackets and emphasis omitted)). "The third element — intent —

'denotes purposefully improper interference,' and 'requires a state of mind or

motive more culpable than mere intent.'" *Haw. Med. Ass'n v. Haw. Med. Serv.

Ass'n, Inc.*, 113 Haw. 77, 116, 148 P.3d 1179, 1218 (2006) (quoting *Omega Envtl.,

Inc. v. Gilbarco*, 127 F.3d 1157, 1166 (9th Cir. 1997) and *Locricchio v. Legal

Servs. Corp.*, 833 F.2d 1352, 1358 (9th Cir. 1987)). "In other words, the plaintiff

must prove that the defendant either pursued an improper objective of harming the

plaintiff or used wrongful means that caused injury in fact." *Id.* (quoting *Omega

Envtl., Inc.*, 127 F.3d at 1166) (square brackets omitted)). "[I]t must be shown that

the third party acted with intent and legal malice, i.e., 'the intentional doing of a

harmful act without legal or social justification or excuse, or, in other words, the

wilful violation of a known right.'" *Chow v. Alston*, 2 Haw. App. 480, 484, 634

P.2d 430, 434 (1981) (quoting 45 Am. Jur. 2d, *Interference* § 3 (1969)).

In their briefing, the parties focus primarily on the fifth element —

whether the FAC states a proper breach-of-contract claim against CIT/Financial

Freedom — because if there was no breach, then Count V necessarily fails.

Nevertheless, although the court has now allowed a breach-of-contract claim to

continue, Count Five fails for lack of the requisite intent. In this regard, the FAC

alleges:

> Lloyd's, Great Lakes and Seattle Specialty intentionally
> and unjustifiably interfered with Plaintiff's and the
> Class's rights under the mortgage contracts, as described
> above, by, *inter alia*, entering into an exclusive
> relationship with Financial Freedom and their affiliates,
> whereby Lloyd's, Great Lakes and Seattle Specialty
> provided compensation (kickbacks, reinsurance, and low
> cost services) to Financial Freedom in exchange for the
> exclusive right to force-place inflated and unnecessary
> premiums which are purposefully and knowingly charged
> to Plaintiff and the Class.

FAC ¶ 176.

Under the alleged scheme, CIT/Financial Freedom charged Wieck for

improperly inflated premiums that included the unnecessary "commissions" or

"kickbacks." But there are no allegations that the other Defendants (who allegedly

paid the commissions to CIT or received kickbacks from CIT) directed

CIT/Financial Freedom to then charge Wieck for those amounts, and to cause a breach of the mortgage. That is, there are no factual allegations indicating that Seattle Specialty, Lloyd's or Great Lakes *interfered* with the mortgage contract with an improper objective of harming Wieck. *See Haw. Med. Ass'n*, 113 Haw. at 116, 148 P.3d at 1218. Under the FAC's allegations, they did not intend to *interfere* with the mortgage between Wieck and CIT, nor did they intend to *cause* CIT to breach the mortgage.

If CIT/Financial Freedom breached the mortgage by charging Wieck "unnecessary" costs, then these Defendants may have been participants in that breach, but they did not thereby have the intent to interfere with that contractual relationship. At most, these Defendants had their own agreement with CIT regarding monitoring insurance aspects of CIT's loans (including compensation), but that does not mean that these Defendants intended to induce CIT/Financial Freedom to breach the mortgage by charging "unnecessary" costs of LPI to Wieck. Seattle Specialty, Lloyd's or Great Lakes' alleged actions in participating in, or making, material misrepresentations to Wieck may be actionable under HRS chapter 480, but they are not actionable (at least not as currently pled) under an intentional-interference-with-contract theory.

Count Five is DISMISSED without prejudice. Wieck may attempt to cure its deficiencies in an amended complaint.

### G. Count Eight — TILA Violations Against CIT

CIT moves to dismiss Count Eight, which seeks damages against CIT for violating the Truth in Lending Act, 15 U.S.C. §§ 1601 et seq., (specifically, 12 C.F.R. § 226.17(c)) by (1) failing to provide new TILA disclosures when charges for LPI were added to the loan balance, and (2) failing to disclose the amount and nature of the "compensation" that was received from the other Defendants as a result of the purchase of LPI. FAC ¶ 211.

"The declared purpose of [TILA] is 'to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him [or her] and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices.'" *Beach v. Ocwen Fed. Bank*, 523 U.S. 410, 412 (1998) (quoting 15 U.S.C. § 1601(a)). "With respect to residential mortgages, TILA aims 'to assure that consumers are offered and receive residential mortgage loans on terms . . . that are understandable and not unfair, deceptive or abusive.'" *Wilson v. EverBank, N.A.*, 77 F. Supp. 3d 1202, 1221 (S.D. Fla. 2015) (quoting 15 U.S.C. § 1639b(a)(2)). And, "[a]s Plaintiffs point out, several courts have held that, when

a defendant force places insurance and adds that amount to the principal owed, then the defendant has an obligation to provide new disclosures under TILA." *Cannon v. Wells Fargo Bank N.A.*, 917 F. Supp. 2d 1025, 1045 (N.D. Cal. 2013) (citing cases).

But even if the court accepts this TILA theory for charges associated with LPI, TILA claims for damages must be brought 'within one year from the date of the occurrence of the violation." 15 U.S.C. § 1640(e). "For violations of TILA's disclosure requirements, this one-year period generally begins to run from the date of consummation of the loan." *Sakugawa v. IndyMac Bank, F.S.B.*, 2010 WL 4909574, at *3 (D. Haw. Nov. 24, 2010) (citing *King v. California*, 784 F.2d 910, 915 (9th Cir. 1986)). "The same is true for alleged violations of Regulation Z, 12 C.F.R. § 226." *Pregana v. CitiMortgage, Inc.*, 2015 WL 1966671, at *6 (D. Haw. Apr. 30, 2015), *aff'd*, 702 F. App'x 624 (9th Cir. 2017) (citation omitted); *see also Hubbard v. Fidelity Fed. Bank*, 91 F.3d 75, 79 (9th Cir. 1996) ("TILA's one-year statute of limitations . . . bars plaintiffs' claims that [defendant] failed to make appropriate initial disclosures under 12 C.F.R. § 226.18(f)(1) (1983) and 12 C.F.R. § 545.33(f)(7) (1986).").

And here it is undisputed that the letters Wieck received in November 2010, and March and April 2013 notified her (among other things) that the "cost"

of the force-placed insurance would "be charged to the outstanding balance of [her] loan." FAC ¶ 72. Thus, even accepting that the exact amount and nature of the "cost" of LPI was misrepresented and not disclosed, it is nevertheless undisputed that Wieck knew or should have known with each forced placement of hurricane coverage — in 2010, 2012, and 2013 (well outside the one-year limitations period) — that CIT/Financial Freedom "fail[ed] to provide new disclosures" when charges for LPI were added, and "fail[ed] at all times to disclose the amount and nature," FAC ¶ 211, of the compensation that was received from the other Defendants as a result of the purchase of LPI. Accordingly, Wieck's TILA claim is time-barred unless equitable tolling applies. *See King*, 784 F.2d at 915 (allowing for equitable tolling "in the appropriate circumstances").

But equitable tolling is not appropriate. Wieck argues that equitable tolling applies because "Defendants actively concealed the force-placed insurance scheme and purposefully hid the fact that inflated and unnecessary premiums resulted from kickbacks and not the actual cost of insurance." Pl.'s Opp'n at 29, ECF No. 66. But "[t]his allegation is insufficient to satisfy equitable tolling . . . because even if true, it established no more than the TILA violation itself." *Sakugawa*, 2010 WL 4909574, at *3 (citing *Garcia v. Wachovia Mortg. Corp.*, 676 F. Supp. 2d 895, 906 (C.D. Cal. 2009) ("[T]he mere existence of TILA violations

and lack of disclosure does not itself equitably toll the statute of limitations.")) (other citation omitted). That is, "the Complaint pleads no facts indicating that Defendants prevented Plaintiff from discovering the alleged TILA violation or caused Plaintiff to allow the filing deadline to pass." *Id.* (citations omitted). Again, even if the amount and nature of the "cost" of the premium was not disclosed (something a TILA disclosure might have revealed), the fact that the premiums were being added to the loan balance — and, in that sense, that the credit terms were being changed — was fully disclosed and not actively concealed.

Accordingly, Count Eight is DISMISSED without prejudice. The court will allow Wieck an opportunity to amend her TILA claim, if possible, with non-time-barred allegations, or to provide additional facts justifying equitable tolling.[21]

## H.  CIT Group

Finally, CIT moves to dismiss CIT Group, Inc., because it is named only as a parent holding company. *See, e.g.*, *Cabasug v. Crane Co.*, 2014 WL 527705, at *9 (D. Haw. Feb. 7, 2014) ("[I]t is a basic 'principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation . . . is

---

[21] Wieck's Opposition also refers to TILA obligations regarding insurance premiums and finance charges that she claims were necessary under 12 C.F.R. § 226.18(d) — but the FAC does not clearly plead such allegations, nor mention § 226.18(d). If relevant, Wieck may attempt to state non-time-barred claims on this basis in a Second Amended Complaint.

not liable for the acts of its subsidiaries.'") (quoting *United States v. Bestfoods*, 524 U.S. 51, 61 (1998)).  And reviewing the 73-page FAC, the court agrees that no substantive allegations are made as to CIT Group, Inc.  Accordingly, CIT Group, Inc. is DISMISSED without prejudice.  Wieck may attempt to assert claims directly against CIT Group, Inc. in a Second Amended Complaint, if possible.

## V.  CONCLUSION

Defendants' Motions are GRANTED in part and DENIED in part.  Leave is granted to file a Second Amended Complaint by **May 11, 2018**.  Leave is granted solely as permitted in this Order.  If an amendment is not filed by that date, the action will proceed with the remaining claims of the FAC as set forth in this Order.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, March 30, 2018.



/s/ J. Michael Seabright
J. Michael Seabright
Chief United States District Judge

*Wieck v. CIT Group, Inc., et al.*, Civ. No. 16-00596 JMS-RLP, Order Granting Motions to Dismiss in Part, ECF Nos. 55, 56 & 59, and Granting Plaintiff's Motion Requesting Judicial Notice of Official Government Reports, ECF No. 67